Glenn Rahan DONEGHY, Appellant

v.

COMMONWEALTH of Kentucky, Appellee.

No. 2011–SC–000590–MR.

Supreme Court of Kentucky.

June 20, 2013.

Rehearing Denied Oct. 24, 2013.

John Lindsay Tackett, for appellant.

Jack Conway, Attorney General of Kentucky, James Coleman Shackelford, Assistant Attorney General, Raymond M. Larson, Commonwealth's Attorney for the 22nd Judicial Circuit, for appellee.

Opinion of the Court by Chief Justice MINTON.

A circuit court jury convicted Glenn Rahan Doneghy of second-degree manslaughter, leaving the scene of an accident, second-degree assault, fourth-degree assault, first-degree possession of a controlled substance, possession of marijuana, and possession of drug paraphernalia, resulting in a judgment sentencing Doneghy to a total of twenty years' imprisonment.

He now appeals as a matter of right,[1] seeking reversal on seven grounds:

1) the trial court erred by denying Doneghy's motion for directed verdict on the charge of second-degree manslaughter;

2) the trial court erred by failing to sever the charges surrounding Doneghy's arrest from the charges surrounding the collision that resulted in the death of Officer Bryan Durman;

3) palpable error occurred when the Commonwealth mentioned evidence, previously ruled inadmissible, during its closing argument;

4) the Commonwealth's use of inadmissible Kentucky Rules of Evidence (KRE) 404(b) evidence resulted in palpable error;

5) the trial court enabled the Commonwealth to present cumulative emotional evidence, resulting in palpable error;

6) the trial court erred by denying Doneghy's motion for directed verdict on the charge of second-degree assault; and

7) the jury instructions for second-degree assault did not allow the jury to determine the "deadly weapon" element of second-degree assault, resulting in reversible error.

We find that the trial court did not err on any of the grounds so alleged by Done-

ghy. Accordingly, we affirm Doneghy's convictions and resulting sentences.

## I. FACTUAL AND PROCEDURAL BACKGROUND.

Officer Bryan Durman of the Lexington Police Department was dispatched to investigate a noise complaint. According to the complaint, the noise was emanating from a Chevrolet Tahoe parked on the left side of the one-way street. James Williams was the owner of the green Tahoe and was sitting in the passenger seat when Officer Durman arrived on scene around 10:00 p.m. Officer Durman drove past the parked Tahoe, parked his cruiser, and approached the Tahoe on foot. At no point did Officer Durman initiate the emergency lights on his cruiser. The street was not well illuminated at that location.

Officer Durman investigated the noise complaint while standing on the street next to the open passenger door of the Tahoe, which extended a little over three feet into the street. Williams was preparing to exit the vehicle when, according to his trial testimony, Officer Durman's legs were flying over the hood of the parked vehicle as another vehicle struck the officer and the Tahoe Williams occupied. Meanwhile, Ronnie Hood, sitting on the front porch of his home near the scene, heard the crash and jumped up to see what was happening. Hood saw a full-size, red SUV pass his house with the driver attempting to regain control as the SUV sped up to go through the traffic signal in the nearby intersection and make a turn. Hood phoned 911.

Jeri McDowell worked at a local store and her shift ended at 10:00 pm on the night in question. After work, she went to a fast-food restaurant located at another intersection near the point of the collision.

---

1. Ky. Const. § 110(2)(b).

McDowell observed a red SUV with a black male driver, wearing a long-sleeved white shirt and white baseball hat, run a red light as it turned. McDowell notified the police.

Officer Teri Gover was the first officer to reach the scene of the collision. Officer Gover heard Officer Durman request assistance before the collision and was dispatched to the area to help. En route to the scene, a woman stopped Officer Gover and informed her that a vehicle had struck an officer. When Officer Gover reached the scene, she put out a distress call, requesting the immediate response of the Emergency Care Unit (ECU). After putting in the call for help, Officer Gover began performing CPR in an effort to revive Officer Durman. Several other officers arrived on scene within minutes and aided Officer Gover with CPR chest compressions, maintaining the scene, preliminary investigation, and crowd control. During this preliminary investigation, bystanders told Officer Gover and some of the other officers that a maroon Expedition was the vehicle that struck Officer Durman and that description was broadcast over the radio. Various portions of Officer Durman's utility belt were found throughout the scene by many of the officers arriving on scene.

Paramedics arrived on scene shortly after the group of officers. Officer Durman was transported to the University of Kentucky Hospital where he was later pronounced dead.

About an hour after Officer Durman was struck, Detective Ben Shirley discovered a vehicle matching the description of the suspected "run" vehicle behind an apartment building. Detective Shirley noticed that there was damage to the front of the vehicle on the driver's side and to the driver's side mirror. After receiving infor-

mation from residents in the apartment building that the owner of the SUV, later discovered to be Doneghy, lived in the building, police entered the building and knocked on the door of Doneghy's residence. Despite the officers' repeated attempts to make their presence known, Doneghy refused to answer the door. Crisis negotiators arrived but were not successful in getting Doneghy to come out of the apartment.

After obtaining a search warrant, the police decided to perform a "breach and hold," a maneuver in which the door would be opened slightly and held to allow the police to see inside. The door was barricaded from inside the apartment, so the door would only open about a foot. The police then opted to use a chemical agent to force Doneghy out of the apartment. Two rounds were fired into the apartment through the back bedroom window, which caused Doneghy to flee out the front door and attempt to escape through the back door of the apartment building. Doneghy was met by several officers who ordered him to the ground. Doneghy refused and was tackled by the officers. During the struggle, Doneghy attempted to stab one of the officers with a knife. The police searched Doneghy after subduing him, finding baggies of suspected marijuana and cocaine and car keys that unlocked the suspected "run" vehicle.

At trial, the jury convicted Doneghy of[2]

- second-degree manslaughter, for which the jury recommended a ten-year sentence;
- leaving the scene of an accident/failure to render aid or assistance, for which the jury recommended a five-year sentence;
- second-degree assault, for which the jury recommended a ten-year sentence;

---

**2.** The jury found Doneghy not guilty of three counts of third-degree assault.

- fourth-degree assault, for which the jury recommended a twelve-month sentence;
- first-degree possession of a controlled substance, for which the jury recommended a five-year sentence;
- possession of marijuana, for which the jury recommended a twelve-month sentence; and
- possession of drug paraphernalia, for which the jury recommended a twelve-month sentence.

The jury further recommended that the sentences for second-degree manslaughter, leaving the scene of an accident, second-degree assault, and possession of a controlled substance run consecutively and the sentences for fourth-degree assault, possession of marijuana, and possession of drug paraphernalia run concurrently. In total, the jury recommended Doneghy serve thirty years' imprisonment. At sentencing, the trial judge rejected the jury's recommended sentences and imposed instead a total sentence of twenty years' imprisonment.[3]

## II. ANALYSIS.

### 1. The Trial Court did not Err in Denying Doneghy's Motion for Directed Verdict on the Second–Degree Manslaughter Charge Because the Commonwealth Presented Sufficient Evidence.

 Doneghy first claims that the trial court erred in denying his motion for a

directed verdict of acquittal because the evidence produced at trial was insufficient to support his conviction for second-degree manslaughter.[4] The thrust of Doneghy's argument is that the Commonwealth did not adequately prove Doneghy's wanton mental state.

 When reviewing a ruling on a motion for directed verdict, we turn to the standard outlined in *Commonwealth v. Benham*:

> On motion for directed verdict, the trial court must draw all fair and reasonable inferences from the evidence in favor of the Commonwealth. If the evidence is sufficient to induce a reasonable juror to believe beyond a reasonable doubt that the defendant is guilty, a directed verdict should not be given. For the purpose of ruling on the motion, the trial court must assume that the evidence for the Commonwealth is true, but reserving to the jury questions as to the credibility and weight to be given to such testimony.[5]

On appellate review, we must determine if, given the totality of the evidence, "it would be clearly unreasonable for a jury to find guilt."[6] If so, the defendant is entitled to a directed verdict of acquittal. Further, the Commonwealth must only produce more than a "mere scintilla" of evidence to defeat a defendant's motion for a directed verdict.[7]

Doneghy argues that the Commonwealth failed to produce even a scintilla of

---

3. The trial judge elected to order the sentences for leaving the scene of an accident and possession of a controlled substance to run concurrently rather than consecutively as the jury had recommended. Effectively, this cut ten years off of Doneghy's sentence.

4. This issue was properly preserved for our review because Doneghy moved for a directed

verdict at the close of the Commonwealth's case-in-chief and the close of all evidence.

5. 816 S.W.2d 186, 187 (Ky.1991).

6. *Id.*

7. *Commonwealth v. Sawhill*, 660 S.W.2d 3 (Ky.1993).

evidence to convict him. We disagree. With respect to the charge of second-degree manslaughter, Kentucky Revised Statutes (KRS) 507.040(1) requires that a person "wantonly cause the death of another person, including, but not limited to, situations where the death results from the person's ... [o]peration of a motor vehicle." A person acts "wantonly" when he is "aware of and consciously disregards a substantial and unjustifiable risk that the result will occur or that the circumstance exists."[8] The disregarded risk must be "of such a nature and degree that disregard thereof constitutes a gross deviation from the standard of conduct that a person would observe in the situation."[9] Doneghy's main issues with the Commonwealth's evidence are the lack of evidence indicating intoxication, speeding, swerving, or any other perceivable dangerous driving maneuver and the Commonwealth's focus on Doneghy's deliberate actions.

The Commonwealth did not produce an abundance of evidence detailing any possible intoxication of Doneghy,[10] but such evidence was not necessary for the Commonwealth to present a prima facie case of wanton conduct. At any rate, the Commonwealth presented more than a mere scintilla of evidence that Doneghy acted wantonly.

This Court has repeatedly noted that whereas operating a vehicle in an intoxicated state is indicative of wantonness, proof of intoxication is not required. In *Brown v. Commonwealth*,[11] we observed that "intoxication is not a prerequisite to a finding of extreme indifference to human life in a vehicular homicide case" and went on to state that wanton behavior "involves an activity that poses a high risk to human life, undertaken in or directed toward a place where human beings are present; yet [does not] require[ ] intoxication."[12] Admittedly, *Brown* dealt with wanton murder, which requires a higher degree of wantonness—extreme indifference to human life. But we believe the same logic applies to the lower degree of wantonness required for a second-degree manslaughter conviction.

A finding of wantonness in a vehicular homicide does not *require* proof that a defendant was intoxicated, speeding, swerving, or similar dangerous acts, as Doneghy argues. In simplest terms, "one operating an automobile in a manner 'reasonably calculated to injure others using the highway, and under such circumstances recklessly, wantonly and with gross carelessness strikes and kills another,' is guilty of voluntary manslaughter."[13] While intoxication, speeding, or swerving tends to prove wanton conduct, we find meritless Doneghy's contention that the trial court should have directed a verdict because of scant evidence of these facts.

The Commonwealth produced more than a mere scintilla of evidence to show Doneghy's wanton behavior. Shamar Briggs testified that when she saw Doneghy at a gas station shortly before the collision. She said that Doneghy's eyes were red and glossy and he seemed "zoned-out." From this testimony, the jury could infer intoxication. Additionally, both of the Common-

8. KRS 501.020(3).

9. *Id.*

10. Evidence involving toxicology reports was ruled inadmissible by the trial court before trial.

11. 174 S.W.3d 421 (Ky.2005).

12. *Id.* at 426.

13. *Largent v. Commonwealth*, 265 Ky. 598, 97 S.W.2d 538, 542 (1936) (quoting *Jones v. Commonwealth*, 213 Ky. 356, 281 S.W. 164, 166 (1926))

wealth's collision reconstruction experts, Todd Kleinjan and Richard Parkos, testified that Doneghy's vehicle did not unintentionally drift toward the parked car and Officer Durman. Instead, their testimony showed that Doneghy's vehicle traveled on a deliberate path, an angle of 10–12 degrees according to Parkos, toward the parked cars on the street, and continued on this path following the impact, striking the car in front of the Tahoe beside which Officer Durman stood. And Parkos testified that despite the darkness of the street, Doneghy had ample time to see Officer Durman in order to take evasive action. Of course, Doneghy's collision expert testified that the collision was an act of negligence.

Given the totality of the evidence, the jury could reasonably conclude that Doneghy may not have intended to strike Officer Durman or even may not have seen Officer Durman but deliberately steered his vehicle in the direction of cars parked along the street. The risk presented by deliberately driving one's vehicle in the direction of cars parked along the side of a roadway is much greater than merely the potential for substantial property damage. It is certainly not uncommon, perhaps even expected, that persons may be inside or around a parked vehicle or that pedestrians may be nearby who could suffer severe physical injury or even death as a result of this conduct. Accordingly, deliberately steering one's vehicle toward other vehicles parked along the street creates a risk of such a nature and degree that disregarding it is a gross deviation from the standard of conduct that a person would observe in the situation. The Com-

monwealth met its burden and produced more than a mere scintilla of evidence to support Doneghy's second-degree manslaughter conviction. There was no error.

## 2. The Trial Court did not Abuse its Discretion by Trying the Charges Against Doneghy in a Single Trial.

 Doneghy next claims that the trial court abused its discretion and committed reversible error by refusing to sever the charges arising out of the collision, murder, and leaving the scene of an accident from the remaining charges arising out of his arrest and drug possession. The basis of Doneghy's complaint is that the charges were unrelated. Joining the charges, he asserts, simply allowed the Commonwealth to present otherwise inadmissible and highly prejudicial KRE 404(b) evidence. As a result, Doneghy requests his convictions be reversed. Doneghy moved for separate trials before the jury was sworn, properly preserving the issue for appeal.[14]

Multiple offenses may be joined in a single indictment under Kentucky Rules of Criminal Procedure (RCr) 6.18 if the offenses are (1) of the same or similar character or (2) based on the same acts or transactions connected together or constituting parts of a common scheme or plan.[15] Even if the requirements for joinder under RCr 6.18 are satisfied, the court may order separate trials if the defendant would be unduly prejudiced by the joinder.[16] And we recognize some degree of "prejudice is inherent in the joinder of offenses, as it is in any indictment."[17] So in order to mandate severance, or any other relief under RCr 9.16, this Court requires the presence of "undue prejudice, i.e., prejudice that

---

14. See Wilson v. Commonwealth, 695 S.W.2d 854, 858 (Ky.1985).

15. Multiple crimes may then be tried in a single trial under RCr 9.12.

16. RCr 9.16.

17. Peacher v. Commonwealth, 391 S.W.3d 821, 838 (Ky.2012).

goes beyond the inherent prejudice to that which is unnecessary and unreasonable."[18] Historically, in determining whether the joinder results in undue prejudice, "we have asked, with KRE 404(b) particularly in mind, whether evidence necessary to prove each offense would have been admissible in a separate trial of the other."[19]

The rules surrounding joinder aim for a proper balance between the prejudice inherent in the joinder of charges in a single trial and the interests of judicial economy. This Court has traditionally given trial courts great discretion to strike that balance, refusing to disturb a trial court's joinder determination absent a showing of actual prejudice and a clear abuse of discretion.[20] In the present case, we see a clear relationship between the multiple crimes.

Doneghy argues that the evidence of his arrest and drug possession was irrelevant to the collision and constituted improper evidence under KRE 404(b). We disagree.

Testimony at trial presented a vivid picture of Doneghy's departure from the scene of the collision and his later altercation with police at the place of his arrest. The collision and arrest occurred within hours of each other, in what appeared to be an unbroken chain of criminal conduct.

For more than a century, Kentucky law has held that evidence of a defendant's flight or resistance to arrest is admissible to "show a guilty conscience"[21] "because flight is always some evidence of a sense of guilt."[22] Indeed, in *Fallis v. Commonwealth*, our predecessors held that "where one after the commission of a crime flees from a place, and either evades or actively resists arrest, all facts and circumstances showing the evasion or resistance of arrest even though they disclose the commission of another crime, are competent against him upon a trial for the first offense."[23] Undoubtedly, Kentucky law makes evidence of Doneghy's arrest and resistance to arrest admissible in a trial for the collision with Officer Durman.[24] This conclusion satisfies the evidentiary objections to joinder.[25]

But because the rule of evidence we rely on today stems from common law, which predates the Kentucky Rules of Evidence (KRE), we feel it appropriate to discuss this principle in light of KRE 404(b), the prohibition of other-crimes evidence. Generally speaking, evidence of other crimes or prior bad acts is not ad-

18. *Id.* (internal quotation marks omitted).

19. *Id.* (internal quotation marks omitted).

20. *Cohron v. Commonwealth*, 306 S.W.3d 489, 493 (Ky.2010) (citing *Sebastian v. Commonwealth*, 623 S.W.2d 880, 881 (Ky.1981)).

21. *Rodriguez v. Commonwealth*, 107 S.W.3d 215, 218 (Ky.2003). *See, e.g., Turpin v. Commonwealth*, 140 Ky. 294, 130 S.W. 1086 (1910) ("If one accused of crime flees, or attempts to bribe a witness, or a juror, or to fabricate evidence, all such conduct is receivable as evidence of his guilt of the main fact charged. It is in the nature of an admission. For, it is not to be supposed that one who is innocent and conscious of the fact would flee, or would feel the necessity for fabricating evidence."); *Fallis v. Commonwealth*, 197 Ky. 313, 247 S.W. 22 (1923); *Commonwealth v. Howard*, 287 S.W.2d 926, 927 (1956).

22. *Bush v. Commonwealth*, 726 S.W.2d 716, 716 (Ky.App.1987).

23. *Fallis*, 247 S.W. at 24.

24. Evidence pertaining to Doneghy's arrest would be admissible in a separate trial for the charges stemming from the collision. Accordingly, evidence of the drugs and drug paraphernalia found on Doneghy would be admissible too as they were discovered during a search incident to arrest and would be relevant in a trial for the collision charges.

25. *See Peacher*, 391 S.W.3d at 838.

missible unless there is an applicable exception to the rule. In *Rodriguez v. Commonwealth*, we noted that KRE 404(b)'s list of "other purpose[s]" for which evidence of other crimes, wrongs, or acts is admissible is "illustrative rather than exhaustive."[26] The *Rodriguez* Court went on to hold that evidence of flight and later arrest was admissible for "some other purpose, *i.e.*, an expression of a sense of guilt, within the meaning of KRE 404(b)(1)."[27] Additionally, in *Bush v. Commonwealth*, the Court of Appeals held that evidence of Bush's barricading himself in a house for over two hours and threatening that he had a hostage and would shoot himself, was "properly admitted into trial to show evidence of a guilty conscience."[28] Today we reaffirm longstanding precedent and hold that Doneghy did not suffer undue prejudice as a result of the charges against him being tried in a single trial because the evidence of his fleeing, fortification, and fight with police was offered for an "other purpose" under KRE 404(b); namely, evidence of a guilty conscience. There was no error.

### 3. The Commonwealth's Reference to an Inadmissible Statement During Closing Argument does not Constitute Palpable Error.

■ During the testimony of Shamar Briggs, the trial judge excluded from evidence Briggs's testimony offering her opinion on whether Doneghy should have been driving. But the Commonwealth mentioned this opinion during its closing argument. Doneghy did not object timely to the Commonwealth's mention of Briggs's testimony and now asks for palpable error review.

■ So our review of this issue is governed by the standard outlined in RCr 10.26. For an error to rise to the level of palpable, "it must be easily perceptible, plain, obvious and readily noticeable."[29] In *Brewer v. Commonwealth*, we outlined palpable error review in a similar context of alleged prosecutorial mistake:

A palpable error must be so grave in nature that if it were uncorrected, it would seriously affect the fairness of the proceedings. Thus, what a palpable error analysis boils down to is whether the reviewing court believes there is a substantial possibility that the result in the case would have been different without the error. If not, the error cannot be palpable. Finally, when reviewing claims of prosecutorial misconduct, we must focus on the overall fairness of the trial and may reverse only if the prosecutorial misconduct was so improper, prejudicial, and egregious as to have undermined the overall fairness of the proceedings.[30]

And we have previously held that "[w]hen reviewing claims of error in closing argument, the required appellate analysis must focus on the overall fairness of the trial and not the culpability of the prosecutor."[31] Here, the Commonwealth's passing mention of excluded evidence was

**26.** *Rodriguez*, 107 S.W.3d at 219 (quoting *Colwell v. Commonwealth*, 37 S.W.3d 721, 725 (Ky.2000)).

**27.** *Id.* at 219–20 (internal quotation marks omitted).

**28.** *Bush*, 726 S.W.2d at 717.

**29.** *Brewer v. Commonwealth*, 206 S.W.3d 343, 349 (Ky.2006) (internal quotation marks omitted).

**30.** *Id.* (internal quotation marks and citations omitted).

**31.** *Wheeler v. Commonwealth*, 121 S.W.3d 173, 189 (Ky.2003) (internal quotation marks omitted).

not egregious enough to render the overall trial unfair.

Briggs had already testified directly that Doneghy appeared zoned-out and his eyes were red, as her mother's—a former drug addict—used to be. The trial court had admonished the jury earlier to ignore Briggs's statement that she thought Doneghy should not have been driving. The Commonwealth's discussion of Brigg's testimony about whether Doneghy should have been driving consumed roughly thirty seconds of an hour-long closing argument at the end of a lengthy trial. It is hard to imagine that after hundreds of exhibits and hours of testimony this thirty seconds could destroy the overall fairness of the trial. Counsel for both sides has great leeway during closing argument and although the prosecutor in this case did exceed those limits by commenting on inadmissible evidence, the trial was not fundamentally unfair as a result.[32]

### 4. The Commonwealth did not Impermissibly Use KRE 404(b) Evidence to Obtain a Conviction.

Doneghy next claims that the Commonwealth used the testimony of Melanie "Juicy" White inappropriately, and as a result, bombarded the jury with a substantial amount of evidence accomplishing little other than painting Doneghy as a bad person. Doneghy points to several examples of evidence that should have been inadmissible under KRE 404(b). We disagree with Doneghy's contentions and address each in turn.

White, a self-proclaimed "crack-whore," testified to various activities with Doneghy during the days leading up to the collision. Before she took the witness stand, Doneghy objected to any mention by White of drug use except direct evidence of relevant and recent drug use before the collision. The trial court sustained that objection, and White did not, at any point, testify that Doneghy took drugs with her, instead focusing on her own drug use while staying with Doneghy. To the extent that the errors claimed by Doneghy fall outside the umbrella of this general objection, he requests palpable error review.

First, Doneghy claims that the Commonwealth committed reversible error in its opening statement when the Commonwealth said that Doneghy was a customer of White's, gave her money, and gave her drugs. This issue was actually resolved at trial when Doneghy objected, requested a mistrial, and the trial court admonished the jury. "When an admonitory cure is possible, a mistrial is not required."[33] And the "jury is presumed to follow the trial court's admonition."[34] We see no reason to disturb the trial court's handling of the Commonwealth's opening statement. There was no error, let alone palpable.

Second, Doneghy argues the Commonwealth violated KRE 404(b) in eliciting voluminous testimony from White regarding her drug and sexual activities in the days leading up to the collision. White testified that she was with Doneghy at his apartment during a three to four-day period before the collision. During that time, she engaged in sex with him, smoked a lot of crack and marijuana, went to Applebee's with him and consumed a great deal of

---

32. *See Slaughter v. Commonwealth,* 744 S.W.2d 407, 412 (Ky.1987).

33. *Shepherd v. Commonwealth,* 251 S.W.3d 309, 318 (Ky.2008) (citing *Graves v. Commonwealth,* 17 S.W.3d 858, 865 (Ky.2000)).

34. *Burton v. Commonwealth,* 300 S.W.3d 126, 143 (Ky.2009) (citing *Martin v. Commonwealth,* 170 S.W.3d 374, 381 (Ky.2005)).

food, and passed out at his apartment for an extended period of time. White also testified that she was not with Doneghy in the two days immediately before the collision. And White testified that she told several people she drove Doneghy's vehicle on the night of the collision. Indeed, the police questioned White as a "person of interest."

 As previously mentioned, Doneghy made a general objection before White testified, but the trial court deferred a ruling on the objection. It is the duty of the attorney to seek, and achieve, a ruling on an objection.[35] Accordingly, Doneghy's claims regarding White's testimony are not preserved, so this claim of error must be reviewed under our palpable error standard. The evidence admitted through White's testimony was relevant, albeit to a minor degree, to why White acted the way she did following the collision and was somewhat necessary to dispel any contention by Doneghy that she may have been driving the vehicle at the time of the collision. Regardless, the admission of White's testimony does not rise to the level of palpable error. Doneghy's trial was not manifestly unjust because of it.

 Finally, Doneghy claims the Commonwealth again violated KRE 404(b) through its admission of a video and photograph of Doneghy's messy apartment, littered with drug paraphernalia and pornographic magazines. Again, Doneghy failed to object at trial and now requests us to review for palpable error. The Commonwealth admitted the photo and video to show where contraband and other evidentiary items were located in the apartment and to show that Doneghy owned a white

shirt like the one that witnesses claimed the driver of the SUV in the collision wore. Pornographic magazines were visible in the photo of the white shirts in Doneghy's apartment. This does not rise to the level of palpable error.

 Moreover, the trial court offered to admonish the jury to focus only on the white shirts in the photo, but Doneghy refused. Even if there were error here, Doneghy waived it. "Certainly, we would not expect a trial judge to *sua sponte* admonish the jury to give a limiting effect to evidence to which there was no objection. The failure to give an unrequested limiting admonition is not palpable error."[36] Logic would dictate that if a trial court is not required to offer an admonition, then palpable error is undoubtedly absent when a defendant refuses an offered admonition.

## 5. *No Palpable Error Resulted From the Admission of Emotional Evidence*

Doneghy next urges this Court to find that the trial court erred in allowing the Commonwealth to present cumulative testimony describing events immediately after the collision. Specifically, Doneghy argues that the nine first-responders, seven police officers and two firefighters, called by the Commonwealth, constituted error and rendered the trial unfair. Doneghy also argues that evidence was admitted to glorify improperly Officer Durman. He also accuses the trial judge and members of court staff of openly weeping during testimony. There was only a partial objec-

---

**35.** While the failure to obtain a trial court ruling on an objection can result in the issue being waived, Doneghy requests we review for palpable error and we agree to do so. *See*

*Bell v. Commonwealth,* 473 S.W.2d 820, 821 (Ky.1971).

**36.** *Ernst v. Commonwealth,* 160 S.W.3d 744, 760 (Ky.2005).

tion timely made at trial,[37] so Doneghy requests palpable error review.

■ KRE 403 allows a trial court to exclude relevant evidence if it finds the probative value is substantially outweighed by the danger of undue prejudice or needless presentation of cumulative testimony. Initially, we note that the trial court has a substantial amount of discretion in its performance of this KRE 403 balancing test.[38] The trial judge has a better vantage point to "both detect and assess the concerns in [KRE 403] and to balance them against probative value" as "[h]e hears and sees the witnesses, the performances of the lawyers, and the reactions of the jury."[39] The discretion for courts to "weigh the marginal relevance of . . . evidence against the costs associated with admission" is vital "[b]ecause lawyers reach for every tidbit of evidence supportive of their claims."[40]

■ We note that "[n]ot all evidence that is duplicative is therefore cumulative, and evidence should not be excluded on this ground merely because it overlaps with other evidence."[41] Multiple witnesses bring multiple viewpoints and "testimony from multiple sources about the same event is likely to differ in ways that are helpful to the factfinder."[42]

■ In the present case, the trial court properly exercised its discretion in a dis-

criminating fashion with caution and wisdom.[43] It is undeniable that testimony overlapped to some degree, but some overlap, alone, does not render the evidence cumulative and certainly does not approach palpable error. In addition to similar facts such as how police officers respond to calls or use the radio, the first-responders offered different details and perspectives including: information they received from the crowd gathered at the scene; the tasks they performed at the scene; and the location of evidence they discovered at the scene.

■ Doneghy focuses most of his argument on the overlapping and irrelevant nature of the testimony of the first-responders regarding the extent of Officer Durman's injuries and the life-saving procedures employed. But we have previously held that the Commonwealth may "portray the reality of the violence by giving some background information regarding victims as such is relevant to a full understanding of the nature of the crime."[44] Although the differences in testimony may be slight, we do not find the requisite manifest injustice in its admission to find palpable error.

Doneghy further argues that the Commonwealth violated KRE 403 because the testimony by Officer Durman's fellow officers was emotional, with several shedding

37. Doneghy objected to *further* cumulative testimony after the testimony of the seven police officers. The trial court overruled the objection and allowed the two firefighters to testify because the court believed they would present different viewpoints. Doneghy failed to object to any of the testimony from the firefighters.

38. *Brock v. Commonwealth*, 947 S.W.2d 24, 29 (Ky.1997).

39. CHRISTOPHER B. MUELLER & LAIRD C. KIRKPATRICK, FEDERAL EVIDENCE § 4:12 (3d ed.2012).

40. ROBERT G. LAWSON, *Kentucky Evidence Law Handbook* § 2.10[5] (4th ed.2003).

41. MUELLER § KIRKPATRICK, § 4:15.

42. *Id.*

43. *See id.*

44. *Bowling v. Commonwealth*, 942 S.W.2d 293, 302 (Ky.1997) (*overruled on other grounds by McQueen v. Commonwealth*, 339 S.W.3d 441 (Ky.2011)).

tears on the stand and the trial judge openly crying. At the outset, we feel that it is important to dispose of Doneghy's argument accusing the trial judge of crying during testimony. There is no evidence in the record, apart from Doneghy's own anecdotal assertions, that the trial judge showed any emotion while presiding over this trial. The videotaped record of the trial at no point shows the trial judge crying. Allegations of a trial judge exhibiting emotion during trial testimony are serious and should not be asserted unless firmly anchored by proof in the record. We find no palpable error in that regard.

 Established precedent allows introduction of evidence to show the victim was more than simply a naked statistic or a "nameless void left somewhere on the face of a community." [45] In *Stopher v. Commonwealth*, [46] also dealing with a fallen officer, we found no error in allowing the victim's son to testify in uniform and show the jury a picture of his father. Further, we found no error in allowing the victim's commanding officer to testify to the victim's dedication to his profession and peers. [47] The *Stopher* Court found that testimony to be "nothing more than showing [the victim] was a human being." [48] Again, the jury "may receive an adequate word description of the victim as long as the victim is not glorified or enlarged." [49] We see no measurable difference between the testimony given by Officer Durman's fellow officers and that given in *Stopher*. Certainly, there is no palpable error present as a result of the first-responders testifying about their relationship with Officer Durman.

### 6. The Trial Court did not Err by Denying Doneghy's Directed Verdict for Second-degree Assault.

 Doneghy next urges this Court to find error in the trial court's denial of his motion for a directed verdict of acquittal on the charge of second-degree assault. Given the totality of the evidence and the low burden required of the Commonwealth, we find no error.

To convict an individual of second-degree assault, KRS 508.020(1)(b) requires the Commonwealth to prove that the individual "intentionally cause[d] physical injury to another person by means of a deadly weapon or a dangerous instrument." A "dangerous instrument" is defined in KRS 500.080(3) as "any instrument, . . ., article, or substance which, under the circumstances in which it is used, attempted to be used, or threatened to be used, is readily capable of causing death or serious physical injury." Doneghy argues that the Commonwealth did not produce sufficient evidence showing Sergeant Sam Murdock suffered physical injury, which is defined by KRS 500.080(13) as "substantial physical pain or any impairment of physical condition."

The Commonwealth produced more than a mere scintilla of evidence regarding Sergeant Murdock's physical injury. Sergeant Murdock testified that he tried to grab Doneghy as he fled the apartment building; and as he did, he felt a sharp thrust under his left arm. He realized immediately that he had been cut. Emergency-care personnel on scene provided treatment before he was transported to the hospital for further evaluation. Ser-

45. *McQueen v. Commonwealth*, 669 S.W.2d 519, 523 (Ky.1984).

46. 57 S.W.3d 787 (Ky.2001).

47. *Id.* at 802.

48. *Id.*

49. *Id.* at 803 (quoting *Bowling*, 942 S.W.2d at 302–03).

# 111

geant Murdock's medical records disclosed that he sustained a small wound not past the epidermis, with no blood loss.

In *Commonwealth v. Potts,*[50] this Court held that when dealing with a deadly weapon or dangerous instrument, "[t]he requirements of the statute under these circumstances are met when *any injury* results, as the words 'impairment of physical condition' used in the KRS 500.080(13) definition, simply mean 'injury.' "[51] The *Potts* Court adopted the holding from the Court of Appeals in *Meredith v. Commonwealth.*[52] In *Meredith,* the Court of Appeals upheld a second-degree assault conviction for a superficial wound to the hand, similar in severity to the injury sustained by Sergeant Murdock in this case. The Commonwealth produced more than a mere scintilla of evidence that a "physical injury" resulted from Doneghy's intentional use of a "deadly weapon" or "dangerous instrument." There was no error.

### 7. The Jury Instruction for Second–Degree Assault was not Erroneous.

Finally, Doneghy argues that the jury instruction for second-degree assault was incorrect and accordingly, the conviction must be vacated. Doneghy condemns the instructions as erroneous because the determination of whether the paring knife used by Doneghy qualified as a "dangerous instrument" or "deadly weapon" was improperly made by the trial court rather than by the jury. We disagree but do note that the jury instructions could have been clearer.

The trial court in this case submitted the following instruction regarding second-degree assault to the jury:

You will find the Defendant guilty of Assault, Second Degree under this Instruction if, and only if, you believe from the evidence beyond a reasonable doubt that in this county on or about April 29, 2010, and before the finding of the Indictment herein, he intentionally caused a physical injury to Sam Murdock by *cutting him with a knife, which was not an ordinary pocket knife or hunting knife.* (emphasis added).

One of the essential elements of second-degree assault is the intentional use of a "dangerous instrument" or "deadly weapon." In this case, because the method of inflicting injury was a knife, an object explicitly listed under the definition of "deadly weapon" in KRS 500.080(4), the trial court determined that "dangerous instrument" was not a question for the jury to decide.[53]

In *Thacker v. Commonwealth,*[54] this Court adopted the reasoning of the United States Supreme Court and held that the jury must determine every essential element of the crime, including the application of law to fact. Here, Doneghy argues that the trial court erred because it did not

**50.** 884 S.W.2d 654 (Ky.1994).

**51.** *Id.* at 656.

**52.** 628 S.W.2d 887 (Ky.App.1982).

**53.** *See* WILLIAM S. COOPER, *Kentucky Instructions to Juries* § 3.12 (Donald P. Cetrulo ed., 5th ed.2006) ("KRS 500.080(4) defines certain instruments as 'deadly weapons.' Thus, it is unnecessary ever to define the words 'deadly weapon.' Whether a particular instrument is or is not a deadly weapon should be incorporated into the instruction itself.

Whether other alleged weapons are 'dangerous instruments' must be determined by the jury using this definition in most instances."). We would note that we find this language to be in conflict with our decision in *Thacker.* Whether a device or weapon is a "deadly weapon" or "dangerous instrument" is a question for the jury and should not be determined by the court.

**54.** 194 S.W.3d 287 (Ky.2006).

allow the jury to determine every element of the second-degree assault charge. Upon first review, it does seem that the jury in this case was precluded from making the legal determination of whether or not the knife used by Doneghy was indeed a deadly weapon. This is mainly because the term *deadly weapon* is notably absent from the instruction. Although the actual term is absent, the applicable definition is present in the instructions.

■ We surmise that the trial court used the reasoning of *Potts* in drafting its instructions because it equated a dangerous instrument with a deadly weapon in using the "not an ordinary pocket knife or hunting knife" language.[55] In *Potts,* this Court held that if "it is undisputed from the evidence that the instrument employed on the occasion in question is one so capable [of causing death or serious physical injury] and that it was in fact used or attempted or threatened to be used, then the question becomes one of law for the court to determine." Further, the *Potts* Court went on to hold that in a situation such as this:

> the 'dangerous instrument' could be equated with a 'deadly weapon,' a partial list of which the General Assembly has set out in KRS 500.080, including firearms and knives other than ordinary pocket-knife or hunting knife. If the weapon is one of those so designated, then there is no need to define 'deadly weapon' for the jury. The issue should be determined by the court as a matter of law.[56]

At the hearing to settle the jury instructions in the present case, the Commonwealth's argument, relying heavily on KENTUCKY INSTRUCTIONS TO JURIES by Cooper, tracked the *Potts* language nearly verbatim. The *Potts* Court relied upon *Hicks v.*

*Commonwealth* for this reasoning, a case we explicitly overruled in *Thacker.* So to the extent that *Potts* is still good law on this issue, we overrule it today. The trial court is not allowed to determine whether the object used to inflict injury is a deadly weapon as a matter of law. A trial court must submit all of the essential elements of the crime to the jury for determination.

■ Here, the trial court did not determine that the knife actually was a deadly weapon. Instead, the trial court determined that if the knife used by Doneghy were to satisfy the listed elements of second-degree assault, it must be a deadly weapon rather than a dangerous instrument. The trial court stopped short of taking the final step and applying the law to the facts. The jury was still free to decide that the knife at issue was not a deadly weapon, essentially that the knife *was* either a pocketknife or hunting knife.

We find no error in the jury instruction in the present case, but better practice requires the adherence to the jury instruction modeled in *Thacker,* which asks the jury to determine whether the weapon used was a deadly weapon or dangerous instrument.

### III. CONCLUSION.

For the foregoing reasons, we affirm the judgment of conviction and sentence.

All sitting. All concur.

---

55. *See* KRS 500.080(4).

56. *Potts,* 884 S.W.2d at 656.