# IMPORTANT NOTICE
# NOT TO BE PUBLISHED OPINION

THIS OPINION IS DESIGNATED "NOT TO BE PUBLISHED." PURSUANT TO THE RULES OF CIVIL PROCEDURE PROMULGATED BY THE SUPREME COURT, CR 76.28(4)(C), THIS OPINION IS NOT TO BE PUBLISHED AND SHALL NOT BE CITED OR USED AS BINDING PRECEDENT IN ANY OTHER CASE IN ANY COURT OF THIS STATE; HOWEVER, UNPUBLISHED KENTUCKY APPELLATE DECISIONS, RENDERED AFTER JANUARY 1, 2003, MAY BE CITED FOR CONSIDERATION BY THE COURT IF THERE IS NO PUBLISHED OPINION THAT WOULD ADEQUATELY ADDRESS THE ISSUE BEFORE THE COURT. OPINIONS CITED FOR CONSIDERATION BY THE COURT SHALL BE SET OUT AS AN UNPUBLISHED DECISION IN THE FILED DOCUMENT AND A COPY OF THE ENTIRE DECISION SHALL BE TENDERED ALONG WITH THE DOCUMENT TO THE COURT AND ALL PARTIES TO THE ACTION.

# Supreme Court of Kentucky

## 2018-SC-000133-MR

LAMONT JOHNSON                                  APPELLANT

|  | ON APPEAL FROM KENTON CIRCUIT COURT |
|---|---|
| V. | HONORABLE GREGORY M. BARTLETT, JUDGE |
|  | NO. 16-CR-01050 |

COMMONWEALTH OF KENTUCKY                     APPELLEE

## MEMORANDUM OPINION OF THE COURT

### AFFIRMING

A Kenton County Grand Jury indicted Appellant, Lamont Brandon Johnson, for murder and for being a first-degree persistent felony offender (PFO). At trial, the jury found Johnson guilty of murder, and the trial court sentenced him in accordance with the jury's recommendation to life in prison. At sentencing, the trial court dismissed the PFO count of the indictment on the Commonwealth's motion. Johnson appeals to this Court as a matter of right, Ky. Const. §110(2)(b).

Appellant raises four issues on appeal, alleging the trial court erred by: (1) failing to provide the jury with lesser-included offense instructions for first- and second-degree manslaughter, (2) admitting KRE 404(b) evidence of a prior bad act, (3) allowing an ineligible witness to testify in rebuttal, and (4) allowing gruesome autopsy photos to be shown to the jury. After careful review, we affirm.

# I. BACKGROUND

Appellant and Trina Coleman were involved in a turbulent domestic relationship between the months of June and November 2016. The relationship ended abruptly November 2 when Coleman was found deceased in the apartment Appellant sometimes shared with her. Coleman's cause of death was asphyxiation by strangulation. Appellant was charged with her murder.

The Commonwealth's case focused on Appellant's verbal and physical assaultive behavior directed at Coleman and Coleman's attempts to end the relationship following a public episode of physical violence. Sally Moore, one of Coleman's closest friends, witnessed Appellant ram the back of Coleman's vehicle with his vehicle, then physically assault her. Following this August 18, 2016 event, Coleman obtained an emergency protective order that was never served on Appellant. Coleman's friends and family observed and testified to changes in her mental state and behavior following the assault.

Appellant's narrative and the Commonwealth's version of events during the critical two-day period surrounding Coleman's death agree on few details. Both begin with Appellant leaving Coleman's apartment around 10:00 a.m. on November 1. Appellant's actions, whereabouts, and mental state commencing with his departure from the apartment the morning of November 1 and concluding November 2 when Appellant parted company with Vermont Smith, were intensely contested by the parties. Once he left the apartment on November 1, Appellant maintained he never returned. With no eyewitnesses to Coleman's death or the identity of her killer, the Commonwealth put forward a case based on circumstantial evidence, claiming that not only did Appellant return to the apartment, but that he also murdered Coleman there.

2

According to his trial testimony, Appellant left the apartment on November 1 after Coleman went through his cellphone and found contacts with another woman. Later that day, Appellant called his friend Vermont Smith. Seeking to avoid another argument with Coleman and needing his clothes, Appellant asked Smith to retrieve the clothes from Coleman's apartment.

According to Appellant, he arrived at Smith's apartment around midnight November 1 after spending the day driving around aimlessly, smoking and selling marijuana. Smith had not retrieved his clothes from Coleman's apartment. Consequently, Appellant left Smith's apartment during the early morning hours of November 2. That day was spent the same way Appellant spent the previous afternoon: driving around and smoking and selling marijuana. Appellant unsuccessfully tried several times to reach Coleman by phone, and claims he only became aware of Coleman's death when he was arrested several days later.

Agreeing that Appellant left Coleman's apartment on November 1 around 10:00 a.m., the Commonwealth's timeline of events picked up with Coleman visiting her friend Moore at Moore's apartment at 3:00 p.m. Coleman spoke on the phone with her friend and co-worker, Danielle Vasquez sometime around 3:30 p.m. Toni Buttery, Coleman's mom who lived down the street from Coleman's apartment, testified to the most significant timeline event offered by the Commonwealth: Buttery saw Appellant coming out of Coleman's apartment building at 5:00 p.m.

At 6:00 p.m. on November 1, Coleman did not show up for work and did not call her employer. Vasquez testified that it was unusual that she did not receive a phone call from Coleman, because if Coleman was going to miss a

3

shift, she always called. After unsuccessfully trying to locate Coleman for several hours, family and friends broke through the apartment door shortly after midnight on November 2 to find her lifeless body inside the apartment. The medical examiner, Dr. William Ralston, determined her cause of death was asphyxiation by strangulation.

The Commonwealth further disputed Appellant's alibi of time spent on November 1 casually driving around, smoking and selling marijuana. Bianca Rice, an ex-girlfriend and mother of Appellant's child, testified to receiving an emotional phone call from Appellant after 8:00 p.m. on November 1. During this brief call, Appellant claimed his life was over because he had "fucked up" so badly "there was no coming back" from it. Appellant instructed Rice to tell his daughter he loved her.

Appellant's call to Rice that evening was not his only emotional exhibition. Jessica Parks (Vermont Smith's girlfriend) and Smith confirmed Appellant arrived at Smith's apartment around midnight November 1. For the next few hours, Appellant repeatedly said to Smith, "I fucked up" and "she was going to take me back." Appellant described the argument between him and "her" after "she" found another woman's contacts on his phone. Appellant told them repeatedly that he was going to kill himself. He also said he choked "her," but never said who "she" was.

Parks joined the late-night conversation between Smith and Appellant. During that conversation, Appellant asked Parks if she knew "what death smelled like." In describing what she observed about Appellant in the early morning hours of November 2, Parks said he was drunk and not acting like

4

himself. Parks testified that he repeatedly said "I loved her" and hit his head with his hands.

According to Smith, Appellant would pass most of November 2 with him. Appellant spent the night, left that morning, and returned during the day with Appellant's mother. Smith took Appellant's mother to an ATM to get money for Appellant. Following Smith's return from the ATM, he and Appellant went to Smith's daughter's house where Appellant washed some clothes. Contrary to Appellant's testimony, Smith claimed he and Appellant were together on November 2.

The Commonwealth called Bianca Rice as a rebuttal witness to refute Appellant's claims that he was never violent toward women and had never choked or abused any woman. During her rebuttal testimony, Rice testified that Appellant choked her on several occasions, including once to the point of her almost passing out. Rice's description of abuse suffered at Appellant's hand included him biting, hitting, and forcing her to have sex with him while pregnant with his child. Prior to being called as a rebuttal witness, Rice remained in the courtroom following her testimony about the November 1 phone call from Appellant, and she watched several witnesses testify including Appellant. The trial court had ordered separation of witnesses at the start of trial.

At the close of evidence, Appellant tendered jury instructions to the court for lesser-included offenses of first- and second-degree manslaughter. The Commonwealth objected and argued no evidence supported the proposed instructions, especially since Appellant denied killing Coleman or even knowing she was dead for several days. The trial court denied the tendered instructions

5

and did not instruct the jury on manslaughter. After being found guilty of intentional murder, Appellant was sentenced to life imprisonment.

Further background information will be developed as needed.

## II. ANALYSIS

### A. Lesser-included offense instructions

Appellant tendered written instructions for first- and second-degree manslaughter as lesser-included offenses of intentional murder which were denied by the trial court and are his first issue on appeal. The Commonwealth vigorously opposed any instruction other than intentional murder. The trial court acknowledged a duty to instruct on any offense supported by the evidence and made clear there had to be evidence in the record for that instruction. After reviewing the evidence and consideration of counsel's arguments, no support for the requested lesser-included instructions was ascertained by the trial court.

"In a criminal case, it is the duty of the trial judge to prepare and give instructions on the whole law of the case, and this rule requires instructions applicable to every state of the case deducible or supported to any extent by the testimony." RCr 9.54(1); *See also Taylor v. Commonwealth*, 995 S.W.2d 355, 360 (Ky. 1999); *Kelly v. Commonwealth*, 267 S.W.2d 536, 539 (Ky. 1954). Clear and longstanding precedent guides trial courts in providing the parties the fullest opportunity to have their case decided by a properly-instructed jury.

The trial court's obligation to instruct the jury extends to lesser-included offenses upon sufficient evidence to warrant the instruction. *Grimes v. McAnulty*, 957 S.W.2d 223 (Ky. 1997). The obligations imposed by RCr 9.54(2)

6

to provide correct instructions are not limited to the trial court. Rather, RCr. 9.54(2) imposes a duty on counsel to submit the issues to the trial court. That Rule reads:

> No party may assign as error the giving or the failure to give an instruction unless the party's position has been fairly and adequately presented to the trial judge by an offered instruction or by motion, or unless the party makes objection before the court instructs the jury, stating specifically the matter to which the party objects and the ground or grounds of the objection.

*Id.*

Appellate review of the trial court's decision regarding instructions is reviewed under an abuse of discretion standard. *Johnson v. Commonwealth*, 134 S.W.3d 563 (Ky. 2004).

The language of Appellant's tendered instruction is critical to analyzing this issue. Section "A" for both proposed instructions described the criminal act causing the death of Coleman as choking, and Section B for both instructions provided the proposed mental state. The manslaughter in the first-degree instruction read: "B. That in so doing, he did not intend to cause the death of Trina Coleman but intended to cause physical injury to Trina Coleman." The tendered manslaughter in the second degree instruction read: "B. That in so doing, he was acting wantonly as that term is defined under Instruction No. ___." No definition of wanton was tendered.

Before proceeding, we note an absence in the issues for this appeal. Appellant's trial counsel did not tender murder or manslaughter in the first-degree instructions containing extreme emotional disturbance (EED) language. RCr. 9.54(2) requires as a prior condition to being heard on appeal on the issue

of failure to grant an instruction, that instruction must have been offered for the trial court's consideration "by an offered instruction or by motion."

As we have stated,

> It is the duty of counsel who wishes to claim error to keep current on the law, and to object with specificity so that the trial judge will be advised on how to instruct. The underlying purpose of such a rule is to obtain the best possible trial at the trial level and to call any error to the attention of the trial judge, thereby affording him the opportunity to give the correct instructions. RCr 9.54(2) "requires lawyers to assist the judge in giving correct instructions and disallows an ex post facto objection as a means of obtaining a reversal of the judgment on appeal."

*Gibbs v. Commonwealth*, 208 S.W.3d 848, 853–54 (Ky. 2006), *overruled on other grounds by Padgett v. Commonwealth*, 312 S.W.3d 336 (Ky. 2010) (footnotes omitted).

Appellant's efforts to negate the intentional state of mind, both at trial and in his brief, by proposing the events leading to Coleman's death could have happened in a fit of rage or EED, are understandable. Given the unusual way Appellant presented the issue of possible EED instructions to the trial court for consideration, however, it is unclear whether the issue is preserved for appeal. But, because the trial court heard argument at the bench from counsel and considered the EED issue, and we have no caselaw that has discussed the phrase in RCr 9.54 allowing for instruction preservation by "offered instruction or by motion," we treat this issue as preserved for the purposes of this appeal.

Appellant relies on essentially the same evidence in support of his arguments that he was entitled to a first-degree manslaughter instruction based on either the theory that he only intended to hurt Coleman, not kill, or on the theory that he killed Coleman under the influence of extreme emotional

8

distress. He offered an alibi for the afternoon and early evening of November 1, claiming he drove lacking a specific destination, smoking and selling marijuana. Denying ever returning to the apartment, Appellant disavowed killing Coleman. On appeal, Appellant asserts the testimony of three Commonwealth's witnesses was sufficient proof for the trial court to grant the proposed instructions. He asserts the testimony of Rice, Smith and Parks detailing what Appellant said and how he acted, when viewed together, provided sufficient proof for the trial court to instruct the jury on the lesser included offense under either theory.

Turning now to Appellant's arguments, he correctly states that a defense inconsistent with the defendant's theory of the case may be authorized if supported by the Commonwealth's evidence. *Williams v. Commonwealth*, 208 S.W.3d 881 (Ky. 2006). Further, a complete denial does not change entitlement to lesser-included instructions if warranted by the evidence. *See Johnson v. Commonwealth*, 864 S.W.2d 266 (Ky. 1993). In the face of denial, the ability of a trial court to provide the jury with lesser-included instructions requires other evidence to support the instruction. Appellant's reliance on the three above-named witnesses describing his words and behavior to provide that evidence is misplaced.

Assembling a timeline of events from the record reveals the testimony is not supportive of the tendered instructions. Appellant asserted that he and Coleman had an argument on the morning of November 1, and Appellant left the apartment around 10:00 a.m. Coleman visited her friend Moore at 3:00 p.m. then she called Vasquez at 3:30 p.m. Appellant was seen leaving Coleman's apartment at 5:00 p.m. Coleman failed to call or show up for work

9

by 6:00 p.m. A reasonable inference could be drawn that she was already deceased at that time. The descriptions by Rice, Smith, and Parks of encounters with Appellant hours afterward were not illustrative of his mental state when Coleman died.

It was around 8:00 p.m., three hours after he was seen leaving the apartment building, when Appellant made the emotional phone call to Rice. Both Smith and Parks testified Appellant arrived at Smith's apartment after midnight, and Smith placed his arrival after 3:00 a.m. on November 2. Between seven and ten hours after Toni Buttery saw Appellant leaving Coleman's apartment building, Appellant arrived drunk at Smith's apartment.

Appellant's statements and behaviors the evening of November 1 and early morning hours of November 2 resonate with regret after the fact or a coming to terms with what happened. He told Rice, "There was no coming back from this." He told Smith and Parks he "fucked up." There was no testimony Appellant told any of the three witnesses, he only meant to hurt or scare Coleman. What the three witnesses described is not demonstrative of Appellant's state of mind at the time of Coleman's death, but is instead illustrative of his mental state when they spoke to or saw him. The passage of time between leaving the apartment and speaking to Rice allowed Appellant time to reflect and presumably consume alcohol. Rice, Smith, and Parks do not fill in the blanks necessary for the trial court to submit the mental state in Appellant's proposed instruction to the jury.

The disagreement between Appellant and Coleman caused by her scrutinizing his cellphone and finding contacts with another woman occurred before Appellant left Coleman's apartment at 10:00 a.m. on November 1. When

10

Appellant called Smith later that day asking him to pick up clothes from Coleman's apartment, the disagreement was the reason for the call. Coleman, very much alive, visited Moore and spoke with Vasquez by phone later that afternoon. The testimony of Smith, Parks, and Rice points to Appellant as Coleman's killer, a reality grudgingly acknowledged in defense counsel's closing argument, and casts no light on Appellant's mental state when Coleman died.

The trial court relied on *Parker v. Commonwealth*, which makes clear the following:

> Lesser-included offense instructions are proper if the jury could consider a doubt as to the greater offense and also find guilt beyond a reasonable doubt on the lesser offense. *Skinner v. Commonwealth*, 864 S.W.2d 290 (Ky. 1993). All instructions must be supported by the testimony and evidence presented at trial. *See Lee v. Commonwealth*, 329 S.W.2d 57 (Ky. 1959).

952 S.W.2d 209, 211 (Ky. 1997).

No evidence in the record supports a jury finding of first-degree manslaughter based on an EED theory. To support an instruction for EED, Johnson was required to present to the jury evidence that there was "'adequate provocation' for the disturbance—that is, a 'triggering event' that caused the EED . . . . Although the 'triggering event' may or may not immediately precede the criminal act, it must be 'sudden and uninterrupted.'" *Keeling v. Commonwealth*, 381 S.W.3d 248, 265 (Ky. 2012) (citing *Holland v. Commonwealth*, 114 S.W.3d 792, 807 (Ky. 2003); *Fields v. Commonwealth*, 44 S.W.3d 355, 359 (Ky. 2001); *Springer v. Commonwealth*, 998 S.W.2d 439, 452 (Ky. 1999)). "Because one's emotional response to a situation may dissipate over time, a subsidiary inquiry arises as to whether there intervened between the provocation and the resulting [assault] a cooling-off period of sufficient

11

duration that the provocation should no longer be regarded as 'adequate.'" *Id.* Based on the Commonwealth's timeline, Appellant would have had between five and one-half hours, if Coleman died right after she spoke to Vasquez on the phone, and seven hours, if Coleman died right before her neighbor saw Johnson leaving her apartment, to "cool off" between the time he and Coleman fought and Coleman purportedly died. Even if the argument between Coleman and Johnson could be considered a "triggering event" of "adequate provocation," the lengthy time between when Johnson left Coleman's apartment and when Coleman was killed, while he was out driving around, constitutes a "cooling off period" rendering any provocation inadequate.

Furthermore, no evidence in the record supports a jury finding of first-degree manslaughter based on an intent to injure but not kill when viewed in conjunction with Appellant's denial and alibi. An acquittal on the greater offense of murder and in its place a conviction for the lesser offense of manslaughter in the first degree would not be reasonable under the standard set out in *Allen v. Commonwealth*, 338 S.W.3d 252, 255 (Ky. 2011):

> An appellate court likewise applies this "reasonable juror" standard to a claim that the trial court erred by refusing to give a lesser included offense instruction. Considering the evidence favorably to the proponent of the instruction, we ask, as just noted, whether a reasonable juror could acquit of the greater charge but convict of the lesser.

Turning now to the second proposed instruction for manslaughter in the second degree, the testimony of Dr. William Ralston, the medical examiner, refutes the sought after mental state. Death, Dr. Ralston determined, was the result of several minutes of applied pressure blocking the blood supply to the brain through the carotid arteries in the neck. Coleman would have lost

12

consciousness in a few seconds according to Dr. Ralston. Several more minutes of continually applied pressure to the throat would have caused her death in a manner not consistent with "disregarding a substantial and unjustifiable risk." Several minutes of continual choking, after Coleman lost consciousness, is consistent with intent to kill. "Proof of intent in a homicide case may be inferred from the character and extent of the victim's injuries." *Parker*, 952 S.W.2d at 212. The trial court did not err in denying the second-degree manslaughter instruction.

The trial court did not abuse its discretion in denying Appellant's request that it provide the jury with lesser-included instructions of first- and second-degree manslaughter.

## B. KRE 404(b) Evidence

The Commonwealth filed a written KRE 404 notice of its intent to offer evidence about the domestic violence incident on August 18, 2016, at the final pretrial hearing a week before trial. The evidence was offered to prove the victim's state of mind and marked the beginning of Coleman's efforts to end the relationship with Appellant. Appellant's motive to kill Coleman according to the Commonwealth was her attempt to end the relationship.

KRE 404(b) permits prior bad acts evidence to be introduced under limited circumstances which in relevant part are set out from the rule as follows:

> (b) Other crimes, wrongs, or acts. Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible:

13

> (1) If offered for some other purpose, such as proof of
> motive, opportunity, intent, preparation, plan,
> knowledge, identity, or absence of mistake or accident;

The trial court ruled at the hearing that the Commonwealth could elicit testimony about the fact an EPO was taken by Coleman after the event. Reserving it for later consideration, the trial court left open how much factual evidence from August 18, 2016, would be permitted. During trial, Moore's testimony about August 18, 2016, was admitted over Appellant's objection.

The context for the trial court's decision to overrule Appellant's objection to the admission of Moore's testimony begins with four Commonwealth's witnesses who all testified before Moore and without objection. The testimony of Heather Buttery, Danielle Vasquez, Toni Buttery and Beth Case concerning the days after August 18, 2016, described Coleman's actions, what they observed, and what each one did. An assessment of the record discloses the information they provided lessened the prejudicial impact of Moore's testimony.

A brief review of their testimony starts with Heather Buttery, Coleman's sister, describing the changes she observed in Coleman's demeanor after the August 18 event. Coleman became frightened and scared. Coleman sought to trade vehicles with Heather since Appellant knew what Coleman drove. Coleman's friend Vasquez testified she was aware of Coleman's intention to break up with Appellant and knew Coleman obtained an EPO but was not sure about the date she obtained it. Toni Buttery, Coleman's mother, testified she gave Coleman makeup to cover the black eye she received on August 18. Confirming to her mother she intended to break off the relationship with Appellant, Coleman obtained an EPO, and the paperwork was introduced during Toni Buttery's testimony. Beth Case, another friend of Coleman's,

14

testified to taking pictures of bruises for Coleman to use in obtaining the EPO. After obtaining the EPO, Coleman also wanted to swap cars with Case because Appellant knew Coleman's vehicle.

After these four witnesses, Moore was called to the stand to describe what happened August 18, 2016, outside her apartment building. Moore's account began with a phone call from Coleman who said she was on her way to see Moore and that she was afraid of Appellant. Thinking Appellant was less likely to harm Coleman if they met outside, Moore left her apartment. Coleman pulled up in her vehicle, and Moore saw Appellant behind her in an SUV. Appellant then hit the back of Coleman's car with his vehicle, exited his vehicle and began a physical altercation with Coleman, attempting to get her out of her vehicle. At this point in Moore's testimony, Appellant's counsel raised a 404(b) objection claiming the Commonwealth was introducing specific prior bad acts in violation of the trial court's pretrial ruling.

In its brief, the Commonwealth notes the significant amount of 404(b) evidence already introduced without objection. The trial court overruled the objection and Moore continued. Coleman stayed with her for a week and a half following the assault on August 18, 2019, while the locks on Coleman's apartment door were changed. Moore confirmed Coleman obtained an EPO, and Moore testified she drove Coleman back and forth to work. Coleman came to her apartment on November 1, 2016 around 3:00 p.m. appearing very nervous, staying about fifteen minutes, and leaving without saying goodbye.

We review evidentiary issues for an abuse of discretion. "Rulings upon admissibility of evidence are within the discretion of the trial judge; such rulings should not be reversed on appeal in the absence of a clear abuse of

15

discretion." *Simpson v. Commonwealth,* 889 S.W.2d 781, 783 (Ky. 1994). "The test for abuse of discretion is whether the trial judge's decision was arbitrary, unreasonable, unfair, or unsupported by sound legal principles." *Commonwealth v. English,* 993 S.W.2d 941, 945 (Ky. 1999).

We begin with the general rule that prior bad acts against the same victim are largely admissible. In *Driver,* we noted:

> "It has long been a rule in this jurisdiction that threats against the victim of a crime are probative of the defendant's motive and intent to commit the crime[.]" *Sherroan v. Commonwealth,* 142 S.W.3d 7, 18 (Ky. 2004) (citing *Richie v. Commonwealth,* 242 S.W.2d 1000, 1004 (Ky. 1951)); *see also Davis v. Commonwealth,* 147 S.W.3d 709, 722 (Ky. 2004) ("[g]enerally, evidence of prior threats and animosity of the defendant against the victim is admissible as evidence of . . . intent."); *Harp v. Commonwealth,* 266 S.W.3d 813 (Ky.2008) ("As we have definitively held, 'evidence of similar acts perpetrated against the same victim are almost always admissible. . . .'").

*Id.*

> Further clarifying the general rule, we said:
>
> As we have definitively held, "evidence of similar acts perpetrated against the same victim are almost always admissible . . . ." And we do not perceive that any prejudice suffered by Harp was sufficient to overcome the general rule regarding admissibility of similar acts perpetrated against the same victim. Thus, we find no error in the trial court's decision to admit the KRE 404(b) evidence in question.

*Harp,* 266 S.W.3d at 822-823.

Applying the principles in the cases discussed above, Coleman was the victim in both cases. The assault occurred 10 weeks before the murder. It is both relevant and probative. We note:

> this case involves extrinsic acts perpetrated not against an "extrinsic" victim, as it were, but rather against the same person allegedly the victim of the crimes for which the defendant is being tried. Evidence of similar acts perpetrated against the same victim, we have noted many times, is "almost always admissible," under

16

KRE 404(b), because it will almost always be significantly probative of a material issue aside from the defendant's character. *Noel v. Commonwealth*, 76 S.W.3d 923, 931 (Ky. 2002). *See also, e.g., Harp v. Commonwealth*, 266 S.W.3d 813 (Ky. 2008); *Driver v. Commonwealth*, 361 S.W.3d 877 (Ky. 2012); *Lopez v. Commonwealth*, 459 S.W.3d 867 (Ky. 2015).

*Jenkins v. Commonwealth*, 496 S.W.3d 435, 458 (Ky. 2016).

The evidence of the August 18, 2016, assault was probative as to the victim's mental state and Appellant's motive for killing Coleman ten weeks later. The prejudice was significantly less than the probative value especially when viewed in the context of the significant amount of testimony admitted without objection.

### 1. Relevance

Appellant in his brief claims that the events of August 18, 2016 were too remote and thereby not relevant. We previously stated:

> "The requirement that the prior act be 'not too remote' is integral to determining the probative value of the evidence. Thus, an independent act too remote in time will fail the balancing test required by KRE 403." *Robey v. Commonwealth*, 943 S.W.2d 616, 618 (Ky. 1997); *see also English*, 993 S.W.2d at 945 ("[T]his is the point at which the issue of temporal remoteness becomes a factor in determining inadmissibility.").

*Burton v. Commonwealth*, 300 S.W.3d 126, 137 (Ky. 2009).

What is too remote? Appellant raises the issue of remoteness for the ten-week gap between the assault on August 18 and the murder on November 1. Reviewing prior cases, the following extended amounts of time were found to be too remote. For example, sixteen years was found too remote in *Robey v. Commonwealth*, 943 S.W.2d 616, 618 (Ky. 1997); eleven years was also found too remote in *West v. Commonwealth*, 2011-SC-000629-MR, 2013 WL 3155835, at *6 (Ky. June 20, 2013); and four and a half years and seven years

17

were likewise found to be too remote in *Driver v. Commonwealth*, 361 S.W.3d 877, 884 (Ky. 2012). The ten-week period at issue in the current case does not approach the lengthy gaps between events listed above.

When it comes to evaluating questions of remoteness, there is more to the inquiry than just how much time separates the events; who is involved in the events also affects the evaluation. As noted above, Coleman was the victim in both instances. The assault on Coleman occurred 10 weeks, not years, before her murder.

Evidence of the August 18, 2016, assault was probative as to the victim's mental state and the Appellant's possible motive for killing Coleman ten weeks later. The assault began Coleman's efforts to end the relationship—efforts the jury could reasonably infer ultimately led to her death.

### 2. *Prejudicial effect and other crimes evidence*

In resolving questions of admissibility under the rules of evidence, the trial court can find itself as the old saying goes "between a rock and a hard place." The problem is clearly identified by Professor Lawson in The Kentucky Evidence Law Handbook, §2.30[1] [a] at 130, (5th ed. 2013) as follows:

> No problem has been more troublesome for courts than the one involving the admissibility of evidence of "other crimes, wrongs, or acts." It usually arises in criminal cases when evidence of other crimes or bad acts (other than the ones formally charged) is offered against defendants. Such offers confront trial courts with a difficult choice between protecting defendants against unfair prejudice and impeding the proof of charges by the prosecution.

In the case before us, the trial court resolved the dilemma by overruling the objection and allowing Moore to continue testifying. The essential facts about August 18, 2016, had largely been testified to by Moore before the objection was made. After the objection was overruled, the Appellant had

18

available the option of a curative admonition, but none was sought or proposed.

Was the evidence of the assault on August 18, 2016 so prejudicial as to outweigh the probative value? To resolve that inquiry, we look to prior case authority. "It is within the sound discretion of the trial judge to determine whether the probative value of evidence is outweighed by its possible prejudicial effect and to admit or exclude it accordingly." *Rake v. Commonwealth*, 450 S.W.2d 527, 528 (Ky. 1970). Also, "[a] ruling based on a proper balancing of prejudice against probative value will not be disturbed unless it is determined that a trial court has abused its discretion." *Bell v. Commonwealth*, 875 S.W.2d 882, 890 (Ky. 1994).

In this case, the trial court began weighing probative value versus prejudicial effect at the final pretrial hearing in response to the Commonwealth's 404(c) notice. The trial court reserved a final decision on whether to admit evidence of the actual assault until additional testimony was presented at trial, creating an opportunity to have additional context before finally ruling on admission. When the objection to the August 18, 2016, evidence was finally made, the prejudicial effect, viewed in conjunction with the other witnesses' testimony about the effect, physically and emotionally, on Coleman, as well as actions taken after it occurred, did not substantially exceed the probative value.

We find no abuse of discretion in the trial court's overruling the objection. The trial court did not place its balancing of probativeness versus prejudicial effect in the record. That is not dispositive. "We also do not require trial courts to make detailed written findings to support the many evidentiary

19

rulings they must make in the course of a trial." *Cox v. Commonwealth*, 553 S.W.3d 808, 816 (Ky. 2018). Beginning with the pretrial hearing, the trial court correctly excluded actual evidence of the assault until it had a context for that evidence. Relying on the parties to determine when further review concerning the issue would be brought to the court's attention, the trial court did not abuse its discretion in overruling the objection when it was made.

## C. Rebuttal Witness

Bianca Rice was called as a rebuttal witness after Appellant testified that he was not violent toward women, did not choke women, and never abused women. Rice previously testified in the case in chief and was told by the trial court when she finished testifying, she could step down as neither party reserved her for recall. Rice remained in the courtroom watching other witnesses testify. At the start of trial, the trial court ordered separation of witnesses.

At the previously-discussed pretrial hearing, another Commonwealth's 404(c) notice concerned Rice's prior domestic abuse by Appellant. The Commonwealth conceded the evidence of Rice's prior abuse was inadmissible during its case in chief. Rice would not be asked questions during her direct examination about the prior abuse and would be asked questions limited to the November 1 phone call from Appellant. The Commonwealth took the unusual step of warning opposing counsel that if asked the wrong question, despite being told not to do so, Rice would go off topic and talk about the prior abuse.

Appellant objected when Rice was called as a rebuttal witness, noting Rice had been sitting in the courtroom listening to testimony for the better part of two days. He asserted that allowing Rice to testify would violate the court's

20

order separating witnesses. The Commonwealth argued the separation order applied to case-in-chief witnesses, because the Commonwealth had no way of knowing in advance of trial what the Appellant might say if he decided to testify and could not anticipate what rebuttal testimony would be required. Further, the Commonwealth asserted the defendant opened the door to the rebuttal testimony; therefore, the Commonwealth was entitled to walk through it.

The trial court overruled the objection and permitted Rice to testify about Appellant's prior acts of abuse against her.

We review the allegation of error under an abuse of discretion standard. *Jones v. Commonwealth*, 623 S.W.2d 226 (Ky. 1981). "The test for abuse of discretion is whether the trial judge's decision was arbitrary, unreasonable, unfair, or unsupported by sound legal principles." *Commonwealth v. English*, 993 S.W.2d 941, 945 (Ky. 1999). Additionally, an appellant must show he was prejudiced when a rebuttal witness was called after hearing other witnesses testify. As we have held, "a violation without prejudice would not entitle a party to any relief." *Smith v. Miller*, 127 S.W.3d 644, 647 (Ky. 2004).

KRE 615 states in relevant part "[a]t the request of a party the court shall order witnesses excluded so that they cannot hear the testimony of other witnesses and it may make the order on its own motion." The request was made in this case, and the trial court ordered the separation of witnesses.

The rule is designed to prevent improved testimony. "The rationale behind the rule is the recognition that a witness who has heard the testimony of previous witnesses may be inclined, consciously or subconsciously, to tailor his testimony so that it conforms to the testimony given by other witnesses." *McGuire v. Commonwealth*, 368 S.W.3d 100, 112–13 (Ky. 2012) (citing *Smith v.*

21

*Miller,* 127 S.W.3d 644, 646 (Ky. 2004)). The rule is directed at witnesses who have not yet testified. *Mills v. Commonwealth,* 95 S.W.3d 838, 840 (Ky. 2003).

Rebuttal testimony responds to something brought up in a defendant's case that the Commonwealth could not reasonably anticipate and thereby include in the case in chief. As an example, in a hypothetical case, a defendant could testify that he acted in self-defense, and the trial court could permit proper rebuttal testimony. "It is not incumbent on the prosecution to anticipate the defense of self-defense, and certainly when that issue is raised by the defendant's evidence the Commonwealth is entitled to rebut it." *Archer v. Commonwealth,* 473 S.W.2d 141, 143 (Ky. 1971).

In The Kentucky Evidence Law Handbook, Robert G. Lawson explains circumstances when the rebuttal evidence involves character evidence and admissibility of other bad acts of a defendant:

> *Acts Admissible under KRE 404(b):* Particular acts of a criminal defendant are regularly offered into evidence for some purpose other than to prove character (e.g. to prove motive, intent, identity, absence of mistake or accident, etc.) and admitted for that limited purpose. Admission or exclusion of this type of evidence is governed by a special set of rules that evolved at common law, that got codified in Rule 404(b), and are discussed in great detail in § *below.*

§2.25 [3][c](2). The section below is (3) and it reads as follows:

> *Rebutting Sweeping Claims of Virtue:* As discussed in §2.20 above, criminal defendants sometimes go beyond the limits of character rules by making sweeping claims of personal virtue and high morality in denying the commission of criminal acts. In these situations, specific acts that would not be admissible to prove character may be admitted into evidence in rebuttal of the claim of personal virtue and high morality. Defendants "open the door" to the use of such acts, lose their right to objection under KRE 405, retain the right to request a limiting admonition under KRE 405, but subject themselves to a use of evidence that has a real potential for prejudice."

22

In addition to denying killing Coleman, Appellant made a sweeping claim of personal virtue such as those described above by Professor Lawson. His claims of non-violence toward women made Rice's testimony relevant and admissible, testimony the Commonwealth correctly advised the trial court at the pretrial hearing, was not admissible in its case in chief. Appellant cannot now be heard to complain when he made the admission possible. "Or, to borrow the analogy used by our predecessor Court: "the appellants, having opened the book on the subject, were not in a position to complain when their adversaries sought to read other verses from the same chapter and page." *Harris v. Thompson*, 497 S.W.2d 422, 430 (Ky. 1973).

Rice, before trial began, was ready and willing to testify about prior abuse by Appellant. Her desire to talk about the prior abuse, no matter the directive not to do so, was entrenched enough, the Commonwealth explained, if prompted by the wrong question, she would talk about it. The Commonwealth was sufficiently concerned about this possibility that it provided both written and verbal notice in advance of trial to the trial court and to Appellant.

It was within the sound discretion of the trial court to allow Rice to testify in rebuttal. There is nothing in the record to indicate Rice tailored her testimony after listening to other witnesses including Appellant. No other witness testified about prior incidents of abuse. Rice was prepared, before trial began, to tell the jury about the abuse Appellant inflicted on her. Rice's testimony was a minefield clearly marked before trial, Appellant strode there fully on notice of the risk.

Appellant raises KRE 608(b) as a bar to the specific instances of conduct offered by Rice's rebuttal testimony. KRE 608(b) reads as follows:

23

(b) Specific instances of conduct. Specific instances of the conduct of a witness, for the purpose of attacking or supporting the witness' credibility, other than conviction of crime as provided in Rule 609, may not be proved by extrinsic evidence. They may, however, in the discretion of the court, if probative of truthfulness or untruthfulness, be inquired into on cross-examination of the witness: (1) concerning the witness' character for truthfulness or untruthfulness, or (2) concerning the character for truthfulness or untruthfulness of another witness as to which character the witness being cross-examined has testified. No specific instance of conduct of a witness may be the subject of inquiry under this provision unless the cross-examiner has a factual basis for the subject matter of his inquiry.

KRE 608 focusses on cross-examination and limiting how far afield a cross examiner may go in attempting to impeach with extrinsic evidence of specific acts of conduct. Rebuttal evidence, differing from cross examination evidence, involves responding to claims made by the defendant, here a claim of non-violence against women, made when Appellant said he never abused or choked women. "Opening the door" sometimes referred to as "curative admissibility" occurs when one party introduces inadmissible evidence that "opens the door" for the other party to introduce equally inadmissible evidence. *Purcell v. Commonwealth*, 149 S.W.3d 382, 399 (Ky. 2004).

An example, where this Court allowed rebuttal of an opinion by specific evidence in the form of an officer testifying about a photo array. We stated:

> Here, appellate counsel states that the defense theory of the case at trial was that the identification of Ruppee by two witnesses was based on an overly suggestive photo display. A defense witness was the first person to mention a haircut and give an opinion that the defendant was neat and not "scroungy or unkempt." Accordingly, the prosecution was fully entitled to rebut the opinion that the defendant was freshly groomed and always neat in appearance. *Archer v. Commonwealth*, Ky., 473 S.W.2d 141 (1971). The trial judge permitted Officer Davis to testify because his statement contradicted the defense testimony about the identification issue.

*Ruppee v. Commonwealth*, 821 S.W.2d 484, 487 (Ky. 1991)

24

In this case, Appellant denied killing Coleman, but he did not stop there. He claimed he *never* choked women, *never* abused women, and was *never* violent with women. Appellant opened a door for the Commonwealth to present evidence, otherwise inadmissible, through rebuttal. As noted above, a curative or limiting admonition was neither requested nor tendered.

The trial court did not abuse its discretion by overruling Appellant's objection to Rice testifying in rebuttal.

### D.  Autopsy Photos

Appellant seeks review of the trial court allowing gruesome pictures to be shown to the jury. The error is unpreserved. We observe: "When an appellate court engages in a palpable error review, its focus is on what happened and whether the defect is so manifest, fundamental and unambiguous that it threatens the integrity of the judicial process." *Martin v. Commonwealth*, 207 S.W.3d 1, 5 (Ky. 2006). Further we note:

> Under RCr 10.26, an unpreserved error may generally be noticed on appeal *if* the error is "palpable" and *if* it "affects the substantial rights of a party." Even then, relief is appropriate only "upon a determination that manifest injustice resulted from the error." RCr 10.26. "For an error to rise to the level of palpable, 'it must be easily perceptible, plain, obvious and readily noticeable.' " *Doneghy v. Commonwealth*, 410 S.W.3d 95, No. 2011–SC–000590–MR, 2013 WL 3121911, at *6 (Ky. 2013) (quoting *Brewer v. Commonwealth*, 206 S.W.3d 343, 349 (Ky. 2006)). Generally, a palpable error affects the substantial rights of the party "only if it is more likely than ordinary error to have affected the judgment." *Ernst v. Commonwealth*, 160 S.W.3d 744, 762 (Ky. 2005).

*Martin v. Commonwealth*, 409 S.W.3d 340, 344 (Ky. 2013)

In analyzing the photographic evidence in this case, the record discloses no crime scene video, only photographs. The photographic record, twenty-three pictures showing some portion or the entire victim's body, will be reviewed. Eight of the twenty-three photos were taken at the apartment. Three of the eight apartment photos show the victim's head or face with the dried blood and body fluids clearly visible. These three photos could be considered unpleasant and troubling to a lay person not accustomed to seeing crime scene photos, but these photos would not qualify as gory or particularly graphic. The five remaining body photos taken at the apartment display no external or bloody bodily injuries.

The fifteen autopsy photos in the record include five throat and throat tissue photos, four face photos, two right eye photos with the eyelid held open, one upper lip photo with lip held open, and one head-skull photo with the scalp pulled back revealing a large dark area of bruising. The five throat photos display dissected throat tissue and reveal in successive photos progressively deeper layers of injury with the final photo in the series displaying thyroid cartilage fractures. The throat tissue photos show multiple shades of red consistent with bruising and the noted fractures. The throat tissue photos are not pleasant to look at but are not excessively graphic or gory. The single head-skull photo is graphic, displaying the scalp peeled back baring the white skull bone underneath. A large bruise, not visible outside the body, is revealed on the displayed underside of the scalp tissue.

Appellant argues in his brief that the autopsy photos of the throat and head-skull were gruesome with the prejudicial effect exceeding the probative value. The issue was not preserved at trial by motion or objection.

26

As previously discussed, KRE 403 permits a court to exclude otherwise relevant evidence if the probative value of that evidence is substantially outweighed by the danger of undue prejudice. Several cases provide guidance, but two cases decided by this Court in 2015 are dispositive, *Hall v. Commonwealth*, 468 S.W.3d 814 (Ky. 2015), and *Ragland v. Commonwealth*, 476 S.W.3d 236 (Ky. 2015).

We begin with the general rule for photographs, that "a photograph, *otherwise admissible*, does not become inadmissible simply because it is gruesome," *Funk v. Commonwealth*, 842 S.W.2d 476, 479 (Ky. 1992) (emphasis added). The trial judge is always required to weigh the probative value of the gruesome photo in question against the harmful effects that might flow from its admission to determine whether the photo should be excluded notwithstanding the general rule. *Hall v. Commonwealth*, 468 S.W.3d 814, 823 (Ky. 2015) ("[P]hotographs that are probative of the nature of the injuries inflicted are not excluded unless they are so inflammatory that their probative value is substantially outweighed by their prejudicial effect."). *Cf. Adkins v. Commonwealth*, 96 S.W.3d 779, 794 (Ky. 2003).

The Commonwealth, carrying a high burden of proof must have the opportunity to meet that burden with necessary evidence. Even in cases where the crime is heinous and the photographs gruesome, the Commonwealth can seek, within limits, to introduce that evidence. "After all, as this Court has often repeated, '[w]ere the rule otherwise, the state would be precluded from proving the commission of a crime that is by nature heinous and repulsive.'" *Ragland v. Commonwealth*, 476 S.W.3d 236, 249 (Ky. 2015) (quoting *Ratliff v. Commonwealth*, 194 S.W.3d 258, 271 (Ky. 2006).

27

Appellant claims the autopsy photos have little probative value. Analysis of Dr. Ralston's testimony explaining what each photo showed, reveals to the contrary. As to the head and facial photos, the medical examiner testified the blood and body fluid leaking out of the victims' nose was consistent with strangulation. Dr. Ralston described the presence of the fluids as an immediate visible clue to what caused the victim's death. The hemorrhaging documented in the two eye photos was another visible external clue as to the cause of death. The petechial eye hemorrhaging is consistent with death by strangulation.

The five throat tissue photos are illustrative of the throat injuries found by Dr. Ralston and included the fractured thyroid cartilage caused by continued and significant pressure on the throat. When added to the other injury photos documenting visible clues as to the cause of death, the throat tissue photos demonstrate why Dr. Ralston reached his medically certain opinion of death caused by asphyxiation by strangulation.

Dr. Ralston explained each photo shown to the jury on a video screen. The pictures were not visible on the screen for an extended time. The manner of presentation was matter of fact and not done to elicit passion by the jury.

In addition, two autopsy photos reveal head injuries not consistent with strangulation but confirm an assault at or near the time of death. The single photo of the upper lip held open revealing a bruise, and the single head-skull photo of the scalp peeled back revealing a large area of bruising were noted by Dr. Ralston in his investigation into the cause and manner of death.

In *Staples v. Commonwealth* we held "[u]nder this rule, we have many times upheld the Commonwealth's use of autopsy photographs introduced in conjunction with a medical examiner's testimony concerning the cause and manner of a homicide victim's injuries and death." 454 S.W.3d 803, 825 (Ky. 2014).

We further noted about five autopsy photos in *Staples*,

> Although disturbing, as by their nature autopsy photographs tend to be, the five photographs admitted here were no more than were reasonably necessary to provide illustration for the medical examiner's testimony and to support her findings. They were relevant as tending to show not only that the child had been fatally injured, but also that the fatal head injury was of a severity almost certain to have been inflicted and not likely to have happened accidentally.

*Id.* at 825–26.

The autopsy photos drawing Appellant's objection were referenced directly by Dr. Ralston during his testimony. Why and how Dr. Ralston reached his medical conclusions is fully demonstrated by the photos. The only repetitive photos were the five showing the throat tissue, and each one offered a different and more in-depth view of the injuries suffered by the victim. Damage caused by the amount of pressure and time the pressure was applied to the throat is presented in these five throat photos.

The single photo showing the scalp pulled back from the skull, revealing a large area of bruised tissue on the scalp underside, although visually shocking, is unmistakably relevant. The victim died a violent death by strangulation and without this view, the jury would not have seen the large area of bruising otherwise invisible from any other vantage point. The large area of bruising indicates how violent her death was. This single photo was not

29

displayed for an excessive length of time. Dr. Ralston's explanation of the injury disclosed in this photograph was relevant to the issue of cause and manner of death.

Were the autopsy photos so prejudicial as to outweigh their probative value? We hold they were not. Again, *Hall v. Commonwealth* provides guidance. In *Hall*, the jury was shown a gruesome crime scene video, repetitive and gruesome crime scene photos and autopsy photos. This Court said: "On top of that is the sheer number of gruesome photographs admitted. Indeed, in light of their needlessly cumulative and often duplicative nature, it is difficult for us to surmise any reason for introducing all 28 photos other than to elicit unduly prejudicial emotional responses from the jurors." *Hall v. Commonwealth*, 468 S.W.3d 814, 827 (Ky. 2015).

The photos in this case do not resemble photos and videos condemned in other cases, offered primarily to inflame the passions of the jury. A crime scene video was not introduced into evidence, and the photos do not repetitively show the same injuries from multiple angles. These photos were limited to demonstrating specific factual contentions and offered to explain Dr. Ralston's efforts to find the cause of death and to explain his medical opinion derived from those efforts.

For the above stated reasons, we find no palpable error sufficient to merit reversal due to the admission of gruesome autopsy photos.

## III. CONCLUSION

After careful review of the issues presented, we affirm Appellant's conviction and corresponding sentence.

All sitting.  All concur.


COUNSEL FOR APPELLANT:

Brandon Neil Jewell
Assistant Public Advocate


COUNSEL FOR APPELLEE:

Andy Beshear
Attorney General of Kentucky

Joseph A. Newberg II
Assistant Attorney General

# Supreme Court of Kentucky

## 2018-SC-000133-MR

LAMONT JOHNSON        APPELLANT

V.

ON APPEAL FROM KENTON CIRCUIT COURT
HONORABLE GREGORY M. BARTLETT, JUDGE
NO. 16-CR-01050

COMMONWEALTH OF KENTUCKY        APPELLEE

## ORDER DENYING PETITION FOR REHEARING AND MODIFYING OPINION

The Appellant's petition for rehearing of the Opinion of the Court, rendered October 31, 2019, is DENIED; however, the Opinion of the Court is MODIFIED and replaced with the attached opinion. The modification does not affect the holding of the case.

All sitting. All concur.

ENTERED: March 26, 2020.

_____
CHIEF JUSTICE