# IMPORTANT NOTICE
## NOT TO BE PUBLISHED OPINION

THIS OPINION IS DESIGNATED "NOT TO BE PUBLISHED." PURSUANT TO THE RULES OF CIVIL PROCEDURE PROMULGATED BY THE SUPREME COURT, RAP 40(D), THIS OPINION IS NOT TO BE PUBLISHED AND SHALL NOT BE CITED OR USED AS BINDING PRECEDENT IN ANY OTHER CASE IN ANY COURT OF THIS STATE; HOWEVER, UNPUBLISHED KENTUCKY APPELLATE DECISIONS, RENDERED AFTER JANUARY 1, 2003, MAY BE CITED FOR CONSIDERATION BY THE COURT IF THERE IS NO PUBLISHED OPINION THAT WOULD ADEQUATELY ADDRESS THE ISSUE BEFORE THE COURT. OPINIONS CITED FOR CONSIDERATION BY THE COURT SHALL BE SET OUT AS AN UNPUBLISHED DECISION IN THE FILED DOCUMENT AND A COPY OF THE ENTIRE DECISION SHALL BE TENDERED ALONG WITH THE DOCUMENT TO THE COURT AND ALL PARTIES TO THE ACTION.

RENDERED: JUNE 15, 2023
NOT TO BE PUBLISHED

# Supreme Court of Kentucky

2021-SC-0446-MR

ANTHONY BEASLEY                                               APPELLANT

V.

ON APPEAL FROM JEFFERSON CIRCUIT COURT
HONORABLE ANGELA MCCORMICK BISIG, JUDGE
NO. 18-CR-002674

COMMONWEALTH OF KENTUCKY                              APPELLEE

## MEMORANDUM OPINION OF THE COURT

## <u>AFFIRMING</u>

At Appellant Anthony Beasley's (Beasley) trial for killing Bob White (White), the court allowed into evidence statements that the child of the victim made to a police officer within minutes of White being shot. The child was not available as a witness and the statements, recorded on the officer's body camera, were played for the jury. The jury found Beasley guilty of murder and tampering with physical evidence. On appeal, Beasley raises three issues, the primary issue being whether the child's statements were testimonial and thus, Beasley's Sixth Amendment Confrontation Clause right was violated. We conclude the child's excited utterances were not made with the primary purpose of creating evidence for Beasley's prosecution and the trial court did not abuse its discretion by allowing the statements into evidence. We also conclude that the trial court did not abuse its discretion by allowing into

evidence a cell phone video or by allowing the Commonwealth to amend the indictment on the morning of trial. Accordingly, we affirm the Jefferson Circuit Court's judgment convicting Beasley of murder and tampering with physical evidence and sentencing Beasley to twenty-five years in prison.

## FACTUAL AND PROCEDURAL BACKGROUND

On September 6, 2018, Beasley shot and killed White. Beasley admitted shooting White when the officers responded to the scene. He was indicted by a Jefferson County grand jury for committing murder and tampering with physical evidence. At trial, Beasley's defense to the murder charge was self-protection. The jury heard testimony about Beasley and White's relationship and White's criminal history.

In January 2018, Beasley and his roommate moved into an apartment on Winkler Avenue. White and his son, Zion, moved into the same apartment house three to four months later. Beasley and his roommate lived on the first floor, White and Zion lived on the second floor. Zion referred to Beasley as his "uncle."

Beasley and White had known each other since elementary school. Beasley described White as a friend, but also described their relationship to be like Jekyll and Hyde, friends one minute and fighting the next. White was entering Beasley's apartment when no one was home, items were missing, and White taunted them. White also took over Beasley's porch. White would entertain people on the porch and hassle people coming and going from Beasley's apartment. In the three months prior to the shooting, things had

2

gotten unbearable for Beasley and his roommate, and Beasley began to avoid being around White. Beasley had told White that he was no longer welcome in his apartment. Beasley testified that he feared for his life when White was around and that White was constantly being threatening.

According to Beasley, on the day of the shooting, ten-year-old Zion had been at Beasley's apartment since getting home from school. White came to Beasley's apartment that evening even though he no longer had permission to visit; and White had friends waiting outside for him on Beasley's porch. By Beasley's account, White sent and Zion went to the second-floor apartment to make a pallet for bed and to go to sleep.

Beasley testified that he and White got into a fight, and everything happened fast. White pushed Beasley, and Beasley pushed him back. An ashtray tipped over and White stumbled. As White reached into his waistband for his gun and charged Beasley, Beasley pulled his gun from his pocket, closed his eyes and shot.

The medical examiner testified that the entrance of the bullet was most consistent with the gun muzzle being against the skin when it was fired. The bullet entered over the right front scalp and exited over the left ear; it was a right to left, downward, and front to back trajectory. Beasley maintained that White charged him and stated that he did not deliberately place the gun on White's head. He testified that he did not want anyone to die but he had no choice but to shoot.

After shooting White, Beasley sat down on the floor beside him. Beasley

3

put the gun on the floor. Zion came into the living room, touched his dad's head, grabbed his phone, and ran out. Beasley told Zion to run to the neighbor's house and call the police.

After Zion ran off, two men, White's friends who were waiting on the porch, came in and took White's gun. The men also took Beasley's gun, but left the magazine behind. The men left when they heard the sirens.

The first officer arrived at Beasley's apartment building within a minute of the 911 call. This officer and his partner entered Beasley's apartment through the unlocked, wide open back door. They, along with the third officer on the scene, observed White on the living room floor with a gunshot wound to his head and Beasley sitting beside him. An empty gun magazine was on the floor close to Beasley. A shell casing was found by a door. Both the casing and the magazine were .380 caliber. The .380 caliber weapon was never recovered. As captured by the officers' body cameras, a football game was on the television.

Beasley was taken into custody. Beasley made multiple statements that it was his house, White broke into his house, and he was just protecting himself. He also made the statement that he did not know the name of the person who broke into his home. When the Commonwealth questioned him about that statement at trial, Beasley testified that he was frantic and in shock when he answered the officers' questions. At police headquarters, photographs of a red mark on Beasley's arm were also taken. According to the police

4

officer's testimony, no other physical signs of injury were observed on Beasley's body.

In regard to the reason for the fight, Beasley's jail mate testified on behalf of the Commonwealth. The jail mate stated that he had law books and Beasley, considering defenses to the murder charge, talked with him about his case. The jail mate testified that Beasley told him that he had shot White after they argued about White being in Beasley's apartment, bringing Beasley's brother into their drug dealings, and Beasley's brother coming over to the apartment house. The jail mate also testified that Beasley told him that after the shooting two men came into the apartment to clean up what had happened.

Other key evidence introduced by the Commonwealth was Zion's statements to his neighbor right after the shooting[1] and Zion's statements to the officer whose interaction with Zion began within three to five minutes after the shooting.

Zion ran to a house three doors down. There, neighbors who knew Zion, Cynthia and her daughter, were on the back porch of their home and they heard Zion screaming as he ran up, holding a cell phone, "He just shot my daddy. He just shot my daddy." Zion told them that his uncle shot his daddy

---

[1] While Beasley objected to the introduction of Zion's statements through the neighbor's testimony at trial, he concedes the statements were excited utterances. He suggests, however, that if the excited utterances to the neighbor were considered by the trial court when deciding the Commonwealth's motion *in limine* to introduce Zion's statements to Officer Fischer, the trial court might have concluded that Zion's statements to the officer were not excited utterances.

in the head, that his daddy was on the floor and that there was blood everywhere. Zion had blood on his hands. Zion also said that he tried to pick his daddy up when he did not wake up. At some point, Zion told them that the cell phone belonged to his father. Cynthia took Zion in the house and tried to calm him while her daughter called 911. The call was made at 10:39 p.m. and within a minute, officers were arriving at the scene of the shooting.

Zion passed out at the neighbor's house. The daughter opened the door and yelled for police to come help. Officer Fischer arrived. When Officer Fischer's body camera footage was played for the jury, the jury heard Zion repeatedly exclaim, "He shot my daddy in his head," and "He shot my daddy for no reason." Zion also made statements describing the shooting, indicating that he was an eyewitness, and contrary to Beasley's self-protection defense. Beasley maintained that Zion was not present when he shot White and that he would not shoot White in front of Zion.

Beasley was convicted of murder and tampering with physical evidence. The jury recommended a twenty-five-year sentence for murder and a five-year sentence for tampering with physical evidence, to run concurrently for a total of twenty-five years. The trial court sentenced Beasley accordingly.

Beasley brings three issues on appeal. Each is addressed in turn.

## ANALYSIS

I. **The trial court did not abuse its discretion by allowing Zion's statements to a police officer to be admitted into evidence.**

Beasley's first claim is that his Sixth Amendment Confrontation Clause right was violated when the trial court allowed Zion's excited utterances into

6

evidence. He claims the excited utterances were testimonial and therefore inadmissible. We review this claim of error under an abuse of discretion standard.[2] A trial court abuses its discretion when its decision is arbitrary, unreasonable, unfair, or unsupported by sound legal principles.[3]

Zion was not available to testify at trial.[4] The Commonwealth moved *in limine* to introduce Zion's statements captured on the officer's body camera. Defense counsel objected.[5]

As described above, officers arrived at the scene of the shooting within a minute of the 911 call. When Officer Fischer arrived, multiple police cars were parked on the street and Officer Fischer was directed to the neighboring house. An encapsulation of the eight-minute interaction between Officer Fischer and Zion captured on the body camera footage is presented below.

As a preface, when interacting with Officer Fischer, Zion often spoke in a rushed excited manner, was crying and hyperventilating on-and-off, and Zion remained on the floor during most of his interaction with Officer Fischer. Throughout their interaction, the officer tried to calm Zion and regulate his breathing. Zion's unprompted, often repeated statements like, "He shot my

---

[2] *Lewis v. Commonwealth*, 475 S.W.3d 26, 31 (Ky. 2015).

[3] *Commonwealth v. English*, 993 S.W.2d 941, 945 (Ky. 1999).

[4] There is no dispute that Zion was unavailable at trial and Beasley had no prior opportunity to cross-examine him.

[5] In addition to objecting during the pretrial hearing to the statements being introduced into evidence, defense counsel objected again during trial. When the Commonwealth cross-examined Beasley about Zion's statements which portrayed the shooting differently than Beasley, defense counsel argued that the Confrontation Clause was violated because he could not cross-examine Zion on his inconsistent statements.

daddy in his head," "He shot my daddy for no reason," "Why did he shoot my daddy for no reason?" and "My daddy's dead," are not presented to the same extent as their actual occurrence. Officer Fisher testified that his main purpose when questioning Zion was to develop pertinent suspect information for officers at the scene of the shooting.

After Officer Fischer determined Zion was not shot and was not hurt, he initially asked Zion questions about the shooter. During the period when he asked Zion questions about the shooter's whereabouts and appearance, if he heard them, Officer Fischer did not address Zion's unprompted responses, responses often occurring at the same time Officer Fischer was relaying information over his radio. Officer Fischer focused his efforts on getting Zion to answer his questions, often repeating his questions. Zion's statements describing the shooting are in bold typeface.

- As the officer approached the house, Zion can be heard saying excitedly, **"He's been shot. He's been shot. My daddy, he's been shot."**

- Upon the officer's arrival, he asked Zion whether he was hurt. Zion responded to the question and without prompting stated, **"He shot him in his head . . . . He shot my daddy in his head."**[6]

- The officer asked Zion who shot his dad and Zion responded, **"My uncle." "He had a purple gun . . . ."**

- As the officer radioed that Zion stated that his uncle shot the victim in the head, Zion continued, **"My daddy was just laying down on the floor . . . ."**

- The officer asked Zion where his uncle went. Zion stated his uncle was in the house with his daddy. The officer radioed that the uncle may still

---

[6] An ellipsis indicates a portion of Zion's statement which was unclear given the background noise or Zion's excited speech.

8

be in the house.  The officer also requested EMS because Zion complained of stomach pains.

- When the officer asked again whether his uncle was in the house, Zion continued, "**My daddy said stop playing, he said stop pointing the gun at my, my uncle kept pointing the gun at his head and then he shot him.**"[7]

- The officer asked what his uncle was wearing.  Zion responded that he was wearing a wife beater and purple shorts.  As the officer radioed that information, Zion continued, "He shot him and I was like noooo.  My daddy's dead.  My daddy's dead."

- The officer asked Zion if his uncle was a big guy, if he had an afro like Zion, and if he had any tattoos.  At the same time, Zion continued "My daddy was laying down on the floor . . . .  He shot my daddy in his head for no reason.  He's the only one I got in my life and he shot him.  I got blood on my hands."

- Zion was screaming and hyperventilating and the officer worked to calm Zion and his breathing, and asked the others to leave the room.  The officer assured Zion that others were helping his father.  The officer told Zion, "We are going to take care of your daddy, but I need you to be okay."  After the officer assured Zion that "we are going to help [your dad]," Zion stated, "Please help him."

- The officer asked, "What happened? Why did your uncle shoot him?" Zion responded: "**My daddy was just laying down watching the football game.  My uncle kept pointing a gun at him and then . . . bam, and I just looked at my daddy and blood was just leaking out of him like nooo.  He shot my daddy for no reason**."

- The officer again assured Zion that people were helping his father.

- Zion stated, "I tried to get my daddy to get up but he wouldn't get up."

---

[7] With this being an unprompted response, Beasley complains that this statement was improperly admitted into evidence because the Commonwealth interpreted the statement for the jury.  He also makes this complaint in regard to Zion's other statement describing the shooting (the other statement in bold, below) and one other unprompted statement in which Zion describes what happened after the shooting (italicized statement, below).  This unpreserved complaint is addressed below.

9

- Zion wanted to go and check on his father, but the officer assured him that people were helping his dad, that he needed to stay there, and again worked to calm Zion.

- Zion asked the officer questions about his dad's condition and what was happening. Zion then asked excitedly, "What are they going to do with my uncle? Are they going to take him to jail?" The officer responded, "They might. Possibly." Zion then stated excitedly, "Shooting him in his head, that's jail time.[8] That's the only one I got in my life. That's the only one I got in my life." The officer then asked who else lived in the house with Zion and Zion described how he and his dad lived on one floor and his uncle lived downstairs.

- Zion then stated, "*He shot my daddy in his head and . . . check my daddy to see if he was okay, he said he was okay, that's what Spotty,[9] Spotty . . . on his head.*"[10]

- The officer asked what kind of gun was used. Zion described it as a baby gun; like a .38; small, black and purple.

- The officer asked Zion if he saw what his uncle did with the gun. Zion answered that he said, "Aw, shit," and then he laid the gun down.

- The officer asked Zion if it was then that he ran to the neighbor's house and if he saw where his uncle went. As EMS arrived, the officer explained to Zion that a lot would be happening that night, that people would probably be coming to talk with him, and explained that the EMS medics were there to help him.

- Zion continued to repeat, "He shot my daddy for no reason," and cried out for his father. The officer described Zion's emotional distress; his hyperventilation, and his stomach pain to the EMS medics. As the officer was describing that Zion had blood on his hands, thought to be

---

[8] According to evidence presented at trial, White was a convicted felon who spent time in jail.

[9] Spotty is Beasley's nickname.

[10] Addressed below, Beasley complains that during his cross-examination, the Commonwealth interpreted this statement to the jury. Beasley asserts that after Zion's statement, "He shot my daddy in his head," the rest of the statement is inaudible.

10

from his father, Zion excitedly stated that the blood came from his daddy's head, that it was leaking out of his head.

During the pretrial hearing, the Commonwealth and defense counsel agreed that Zion's statements were excited utterances. However, counsel disagreed as to whether the statements violated the Sixth Amendment Confrontation Clause. The Commonwealth emphasized that Zion's statements were not testimonial because they were to aid the officers in an ongoing emergency. Defense counsel countered that when Officer Fischer arrived at the neighbor's house, Beasley was already detained and therefore, there was no ongoing emergency, and consequently, none of Zion's statements were admissible because they were testimonial. Beasley maintains that argument on appeal to a certain extent.

While Beasley suggests that Zion's statements were testimonial because Zion was telling the officer about past events and although it was not a formal interrogation, the officer was asking questions and had his body camera on to record, he primarily argues that there was not an ongoing emergency when the officer arrived and that the purpose of the officer's questions was to investigate the crime. Thus, Beasley argues that Zion's statements were testimonial and should have been excluded from evidence. Nevertheless, Beasley appears willing to concede that the officer perceived that there was an ongoing emergency when he first arrived. Beasley argues at the very least, the trial court should have excluded the statements from the body camera after the officer got the preliminary information.

11

More specifically, Beasley contends there was no longer an ongoing emergency or a threatening situation once the officer determined that Zion was not physically hurt as a result of the shooting, and received answers to questions to help identify the shooter, such as what he was wearing and his whereabouts. Beasley argues that after that point, the officer's questions were aimed toward investigation. Beasley asserts that the circumstances of this case present a situation in which nontestimonial statements turned into testimonial statements, and as recognized by the United States Supreme Court in *Davis v. Washington*[11] and *Michigan v. Bryant,*[12] such testimonial statements are not admissible into evidence. He argues that the statements to questions like "What happened? Why did your uncle shoot your daddy?" are testimonial.

The Commonwealth argues that the trial court did not abuse its discretion when it found that Zion's statements were nontestimonial as all of the statements admitted at trial occurred during an ongoing emergency focused on ending a threatening situation. The Commonwealth further argues that that even if the trial court erred in admitting Zion's statements, the error was harmless beyond a reasonable doubt.

In general, a declarant's out-of-court statement offered to prove the truth of the matter asserted, is not admissible into evidence.[13] However, there is an exception under Kentucky Rules of Evidence which allows hearsay which

---

[11] 547 U.S. 813 (2006).

[12] 562 U.S. 344 (2011).

[13] KRE (Kentucky Rule of Evidence) 801; KRE 802.

12

qualifies as an excited utterances to be admitted into evidence.[14]  An excited utterance is "[a] statement relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition."[15]  Here, the question on appeal is not whether Zion's statements were excited utterances.[16]  The question is whether, despite being excited utterances which may be admitted under the hearsay rules, the admission of the statements violated Beasley's Sixth Amendment Confrontation Clause right to be confronted with the witness against him.  "An excited utterance cannot be introduced into evidence if it is determined to violate the Confrontation Clause because it is a testimonial statement."[17]

Sixth Amendment precedent establishes that nontestimonial statements may be admitted into evidence without violation of the Confrontation Clause, but testimonial statements may not, unless the accused had a prior opportunity to cross-examine the unavailable witness.[18]  *Crawford v. Washington* and its progeny, which includes companion cases *Davis v. Washington* and *Hammon v. Indiana*, and *Michigan v. Bryant,* elaborate on what constitutes a testimonial statement for purposes of the Confrontation Clause.[19]

---

[14] KRE 803.  This exception applies even when the declarant is available as a witness.

[15] *Id.*

[16] Although Beasley's brief suggests that is an issue this Court may consider, Beasley conceded that the statements were excited utterances at the trial court level.

[17] *Hartsfield v. Commonwealth,* 277 S.W.3d 239, 245 (Ky. 2009).

[18] *See Crawford v. Washington,* 541 U.S. 36, 54 (2004).

[19] *See Fisher v. Commonwealth,* 620 S.W.3d 1, 7 (Ky. 2021).

13

In *Crawford*, the Court explained that the text of the Confrontation Clause applies to "witnesses" against the accused, meaning those who "bear testimony."[20] The Court defined "testimony" as typically "a solemn declaration or affirmation made for the purpose of establishing or proving some fact."[21] *Crawford* instructed that a testimonial statement "applies at a minimum to prior testimony at a preliminary hearing, before a grand jury, or at a former trial; and to police interrogations."[22] *Crawford* resolved that the statements of a witness to a stabbing which were given during an interrogation at the police station were testimonial statements.

*Davis* and *Hammon* dealt with statements by victims of domestic abuse and the Supreme Court was tasked with determining "when statements made to law enforcement personnel during a 911 call or at a crime scene are 'testimonial.'"[23] In *Davis*, the victim's statements to a 911 emergency operator were not testimonial, whereas in *Hammon*, the victim's statements to police in an affidavit were testimonial.[24] When reaching those conclusions, the Court applied a primary purpose test, explaining:

> Statements are nontestimonial when made in the course of police interrogation under circumstances objectively indicating that the *primary purpose* of the interrogation is to enable police assistance to meet an ongoing emergency. They are testimonial when the circumstances objectively indicate that there is no such ongoing emergency, and that the *primary purpose* of the interrogation is to

---

[20] 541 U.S at 51.

[21] *Id.*

[22] *Id.* at 68.

[23] 547 U.S. at 817.

[24] *Id.* at 828-30.

establish or prove past events potentially relevant to later criminal prosecution.[25]

*Davis*, however, explains that whether an ongoing emergency exists is simply one factor for consideration in determining whether statements are made for the purpose of "bearing testimony." Other instructive factors for determining whether a statement is testimonial include: (1) whether the events spoken about were actually happening, or were past events; (2) whether what was asked and answered was for the purpose of resolving the situation, rather than simply learning what had happened in the past; and, (4) finally, the level of formality in the interview.[26]

But furthermore, the point of Beasley's primary argument, *Davis* also explained that when dealing with an emergency, circumstances may change, such that "a conversation which begins as an interrogation to determine the need for emergency assistance [may] 'evolve into testimonial statements,' once that purpose has been achieved."[27] *Bryant* addressed the concept of evolving emergencies as well, stating:

> This evolution may occur if, for example, a declarant provides police with information that makes clear that what appeared to be an emergency is not or is no longer an emergency or that what appeared to be a public threat is actually a private dispute. It could also occur if a perpetrator is disarmed, surrenders, is apprehended, or, as in *Davis*, flees with little prospect of posing a threat to the public.[28]

---

[25] *Id.* at 822 (emphasis added).

[26] *Hartsfield*, 277 S.W.3d at 244 (citing *Davis*, 547 U.S. at 827).

[27] *Davis*, 547 U.S. at 828.

[28] 562 U.S. at 365.

While Beasley's focus is on *Davis'* and *Bryant*'s point that statements may evolve from nontestimonial to testimonial, the Commonwealth cites *Bryant* for its clarification of *Davis* and further explanation of the nature of the analysis undertaken to determine whether a declarant's statements are testimonial for Sixth Amendment purposes. While focus is often placed on the officer's primary purpose of the interrogation, *Bryant*, further expounding on the primary purpose test, emphasizes that ultimately, the question is whether the primary purpose of the conversation was to "creat[e] an out-of-court substitute for trial testimony,"[29] and the basis for answering that question is an objective assessment of "all of the relevant circumstances,"[30] and that includes an assessment of the declarant's purpose when making statements.[31]

"In addition to the circumstances in which an encounter occurs, the statements and actions of both the declarant and interrogators provide objective evidence of the primary purpose of the interrogation."[32] "In many instances, the primary purpose of the interrogation will be most accurately ascertained by looking to the contents of both the questions and the answers."[33] Furthermore "[t]he identity of an interrogator, and the content and tenor of his questions," can illuminate the "primary purpose of the

---

[29] *Id.* at 358.

[30] *Id.* at 369.

[31] *Id.* at 367.

[32] *Id.* (citing *Davis*, 547 U.S. at 827).

[33] *Id.* at 367–68.

interrogation."[34]  The Court, however, also recognized that an interrogator may have mixed motives.[35]

The Court also explained that declarants "are also likely to have mixed motives when they make statements to the police."[36]  For example, "[d]uring an ongoing emergency, a victim is most likely to want the threat to her . . . to end, but that does not necessarily mean that the victim wants or envisions prosecution of the assailant.  A victim may want the attacker to be incapacitated temporarily or rehabilitated."[37]

> Alternatively, a severely injured victim may have no purpose at all in answering questions posed; the answers may be simply reflexive.  The victim's injuries could be so debilitating as to prevent her from thinking sufficiently clearly to understand whether her statements are for the purpose of addressing an ongoing emergency or for the purpose of future prosecution.  Taking into account a victim's injuries does not transform this objective inquiry into a subjective one.  The inquiry is still objective because it focuses on the understanding and purpose of a reasonable victim in the circumstances of the actual victim— circumstances that prominently include the victim's physical state.[38]

In sum then, the medical and associated mental "condition of the victim is important to the primary purpose inquiry to the extent that it sheds light on the ability of the victim to have any purpose at all in responding to police

---

[34] *Id.* at 369 (noting that on this point, the majority agreed with Scalia, J., dissenting).

[35] *Id.* at 368.

[36] *Id.*

[37] *Id.*

[38] *Id.* at 368–69 (internal note omitted).

questions and on the likelihood that any purpose formed would necessarily be a testimonial one."[39]

*Bryant* also explained that "there may be *other* circumstances, aside from ongoing emergencies, when a statement is not procured with a primary purpose of creating an out-of-court substitute for trial testimony [and that] [i]n making the primary purpose determination, standard rules of hearsay . . . will be relevant."[40] Therefore, even if an officer asks questions after an emergency is over, the circumstances of the case may indicate that the primary purpose of the questions was not to gain information in anticipation of prosecution.

"When a court must determine whether the Confrontation Clause bars the admission of a statement at trial, it should determine the 'primary purpose of the interrogation' by objectively evaluating the statements and actions of the parties to the encounter, in light of the circumstances in which the interrogation occurs."[41] Here, applying the *Davis* factors and considering the totality of the circumstances, the trial court concluded Zion's statements were not testimonial:

> First, the [shooting] occurred immediately prior to the officer's interaction with Zion and thus involved events that had only recently occurred. Second, at the time of the conversation Zion remained highly agitated, was still screaming, and still had the victim's blood on his hand. In addition, the officer believed the shooter remained at large. The apparent purpose of his inquiries was to determine whether Zion himself needed medical attention and to determine the location of the shooter, as evidenced by the

---

[39] *Id.* at 364–65.

[40] *Id.* at 358–59.

[41] *Id.* at 370.

18

officer's simultaneous radio transmission of each of Zion's statements. Thus, the situation involved an ongoing emergency and the purpose of the officer's inquiries was to resolve that emergency rather than to conduct an investigation in anticipation of prosecution.

Finally, the interaction was decidedly informal, occurring while Zion was screaming on the floor of a bedroom in a neighboring home immediately following the shooting of his father and with the victim's blood still on his hands.

Beasley argues that the emergency was over by the point the officer asked, "What happened? Why did your uncle shoot your daddy?" Even if that were so, the circumstances of this case do not lead to a conclusion that Zion's statements were testimonial.

Beginning with the officer, it is evident that the officer's concerns when entering the neighbor's home were Zion's welfare and then the safety of the public and other officers. The officer acted urgently and his evident primary purpose was collecting information to resolve what he believed was an ongoing emergency.

While we acknowledge that an officer may have mixed motives as he asks questions,[42] the officer's interaction with Zion and the tenor of the challenged questions do not indicate that he was asking Zion questions in anticipation of prosecution, but rather, after gathering initial information about the shooter, he was empathetically engaging with a highly emotional ten-year-old who knew

---

[42] *See also Ohio v. Clark*, 576 U.S. 237, 249 (2015) ("Courts must evaluate challenged statements in context, and part of that context is the questioner's identity. Statements made to someone who is not principally charged with uncovering and prosecuting criminal behavior are significantly less likely to be testimonial than statements given to law enforcement officers." (internal citations omitted)).

his father had been shot and who suspected his father was dead. Nevertheless, the other circumstances of this case, including Zion's actions and undisputed excited utterances, lead to the conclusion that Zion's incriminating statements were not solemn declarations made to "creat[e] an out-of-court substitute for trial testimony."

As the neighbor's testimony and the video reveal, Zion was excitedly proclaiming to all that his uncle shot his father and that he shot his father for no reason, and made other unprompted statements regarding events at the scene of the shooting. *Bryant*'s discussion of a victim's purpose, or lack thereof, when answering an officer's questions,[43] and its recognition that other circumstances aside from ongoing emergencies may result in an officer procuring a statement without the primary purpose of creating an out-of-court substitute for trial testimony are particularly relevant in this case. When reviewing the encounter between Zion and the officer, objectively, there is no indication that the officer asked or Zion answered the questions "What happened? Why did your uncle shoot your dad?" with the primary purpose of Zion's statements being used at trial to convict Beasley. Consequently, we conclude that the trial court did not abuse its discretion by allowing Zion's statements into evidence.

---

[43] *See also Clark*, 576 U.S. at 246-48 (recognizing that young children may not have an understanding of prosecution and concluding in that case, the 3–year–old child did not intend his statements to be a substitute for trial testimony).

20

As noted above, Beasley also suggests that there was another way he was substantially prejudiced by Zion's statements being admitted into evidence. Beasley asserts that during his cross-examination by the Commonwealth, the prosecution took three of Zion's more difficult to hear statements and offered its own interpretation of what was being said by Zion. Beasley complains about Zion's two statements describing the shooting and one statement about what happened afterward. While Beasley argues that the trial court abused its discretion by allowing the jury to hear the prosecution's version of inaudible or indistinct portions of Zion's statements, this complaint was not made when the video was played during trial and the Commonwealth made the statements which Beasley views as improper "interpretation" statements. This argument is unpreserved, and Beasley does not request palpable error review. Thus, we decline to address this argument.[44]

## II. The trial court did not abuse its discretion by allowing a cell phone video to be admitted into evidence.

Beasley's second claim is that the trial court erred by allowing the Commonwealth to introduce into evidence an irrelevant and highly prejudicial video.

Defense counsel objected to the admission of a cell phone video recorded about two and one-half weeks before Beasley shot White. The video showed Beasley, White and Zion on the porch, listening to rap music and cussing. The

---

[44] *Shepherd v. Commonwealth*, 251 S.W.3d 309, 316 (Ky. 2008) ("Absent extreme circumstances amounting to a substantial miscarriage of justice, an appellate court will not engage in palpable error review pursuant to RCr 10.26 unless such a request is made and briefed by the appellant.").

21

Commonwealth argued that it was relevant based upon Beasley's anticipated defenses that he did not know the intruder or that he acted in self-defense. The Commonwealth argued that the video not only established that Beasley knew White, like a previously entered photo, but that Beasley did not fear White. Defense counsel argued that the video was needless, cumulative evidence because it was undisputed that Beasley and White were friends and Commonwealth had already entered a photo of the two taken the day of the shooting; prejudicial because it cast Beasley in an unfavorable light; and not relevant because the video did not show peacefulness on the part of White, the type of evidence which would be proper to counteract the defense's presentation of evidence of White's aggression and assaultive behavior. Concluding that the evidence was relevant, the trial court performed the KRE 403 balancing analysis, concluded that the type of music and language used by Beasley and White were not unduly prejudicial, and overruled the objection.

On appellate review, a trial court's evidentiary ruling will not be overturned absent an abuse of discretion.[45] Further, "in reviewing the trial judge's balancing under KRE 403, the appellate court must view the evidence in the light most favorable to its proponent, giving the evidence its maximum reasonable probative force and its minimum reasonable prejudicial value."[46]

---

[45] *Goodyear Tire & Rubber Co. v. Thompson*, 11 S.W.3d 575, 577 (Ky. 2000).

[46] *McLemore v. Commonwealth*, 590 S.W.3d 229, 234 (Ky. 2019) (quoting *Major v. Commonwealth*, 177 S.W.3d 700, 707 (Ky. 2005)).

All relevant evidence is admissible unless an exception applies.[47] Relevant evidence is "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence."[48] Relevant evidence "may be excluded if its probative value is substantially outweighed by the danger of undue prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, or needless presentation of cumulative evidence."[49]

> What is contemplated as "unfairly" or "unduly" prejudicial is evidence that is harmful beyond its natural probative force:
>
> "Evidence is unfairly prejudicial only if . . . it 'appeals to the jury's sympathies, arouses its sense of horror, provokes its instinct to punish,' or otherwise 'may cause a jury to base its decision on something other than the established propositions in the case.'"[50]

Upon review, it is evident that the video was relevant to (1) the truthfulness of Beasley's statements that he did not know White, and (2) the nature, longevity, and closeness of Beasley's relationship to White. With regard to giving the video its maximum reasonable probative force, with the video showing that Beasley and White were not just casual acquaintances, it allowed the jury to weigh Beasley's credibility when he asserted to police officers that he did not know the man he had shot. It also showed that Beasley spent time

---

[47] KRE 402.

[48] KRE 401.

[49] KRE 403.

[50] *McLemore*, 590 S.W.3d at 234 (quoting Robert G. Lawson, *The Kentucky Evidence Law Handbook*, § 2.10[4][b] (4th ed. 2003) (internal citations omitted)).

23

with White and had no fear of White a few weeks earlier. While Beasley argues that his lack of fear in the video does not prove that he was not afraid at the time of the shooting, we agree with the Commonwealth that this argument goes to the weight that the jury should give to the video, not its admissibility.

With regard to giving the video its minimum reasonable prejudicial value, the video showed Beasley and White hanging out, singing along to a song playing in the background and neither Beasley or White direct any profane or rough language in a threatening way toward anyone. Upon review, we cannot conclude that the trial court abused its discretion when determining that in context, the language used did not rise to the level of arousing the jury's sense of horror, provoking the jury's instinct to punish, or causing the jury to base its decision on something other than the established propositions in the case.

To the extent the video was evidence which overlapped with the previously entered photo, we have previously stated that "'[n]ot all evidence that is duplicative is therefore cumulative, and evidence should not be excluded on this ground merely because it overlaps with other evidence.' Multiple witnesses bring multiple viewpoints and 'testimony from multiple sources about the same event is likely to differ in ways that are helpful to the factfinder.'"[51] Furthermore, based upon the foregoing conclusions, even if the video did not show White's peacefulness, it was otherwise admissible. In sum,

---

[51] *Doneghy v. Commonwealth*, 410 S.W.3d 95, 109 (Ky. 2013) (internal citations omitted).

we conclude the trial court did not abuse its discretion by allowing the Commonwealth to admit the video into evidence.

### III. The trial court did not abuse its discretion by allowing the Commonwealth to amend the indictment.

Beasley's last claim is that the trial court abused its discretion when it allowed the Commonwealth to amend the indictment[52] on the first day of trial.

Beasley was indicted under a principal theory as to both murder and tampering with physical evidence. On the morning of the first day of trial, the Commonwealth moved to amend the indictment to add complicity to both charges. Defense counsel objected. The trial court granted the Commonwealth's motion.

In accordance with RCr 6.16, the trial court may permit an indictment "to be amended any time before verdict or finding if no additional or different offense is charged and if substantial rights of the defendant are not prejudiced. If justice requires, however, the court shall grant the defendant a continuance when such an amendment is permitted." The Commonwealth's factual basis for the amendments was that when the officers arrived at the scene, the murder weapon was gone, whether Beasley hid the gun or someone else helped him hide the gun, and the same person or a different person may have helped Beasley with the murder. Because the charges were essentially the same, either Beasley was acting alone or in complicity with another, the trial court overruled defense counsel's objection.

---

[52] *Herp v. Commonwealth*, 491 S.W.3d 507, 511 (Ky. 2016).

Beasley complains that the Commonwealth declined to name the suspected complicitor or provide any information about how the complicity came about. While recognizing that this Court has traditionally found an allegation of guilt based upon complicity theory to not be an additional or different offense from an allegation of guilt under the principal theory,[53] citing *Wolbrecht v. Commonwealth*,[54] Beasley argues that he was severely prejudiced because he was totally unprepared on the issue raised by the amended indictment. He states there was no proffer made that there was evidence to support the amendment.

> The circumstances in *Wolbrecht* are distinguishable from this case.
>
> In *Wolbrecht,* the original indictment alleged that the three defendants were guilty of murdering the victim either as principals or by engaging in a conspiracy with each other *as a result of which one (1) of the defendants* shot the victim. Half way through trial, the Commonwealth made "a dramatic, 180 degree turn in the case" by amending the indictment to include a charge that an *unknown trigger man* may have actually shot the victim.[55]

Such a dramatic change in the Commonwealth's theory of the case constituted "unfair surprise" and a "cavalier disregard of a person's right to be free from unsubstantiated criminal charges."[56] Amending the indictment in this case to include complicity charges is not comparable to the amendment in *Wolbrecht.*

---

[53] *Commonwealth v. Combs*, 316 S.W.3d 877, 880 (Ky. 2010).

[54] 955 S.W.2d 533, 536-37 (Ky. 1997).

[55] *Commonwealth v. McKenzie*, 214 S.W.3d 306, 308 (Ky. 2007) (internal citations omitted).

[56] *Id.* (citation omitted).

26

With the question ultimately being whether Beasley's substantial rights were prejudiced, citing *McKenzie*, the Commonwealth counters that there was no such prejudice because Beasley had adequate notice of the evidence against him. In *McKenzie*, this Court reversed the Court of Appeals and upheld the trial court's amendment. We stated that the defendant "suffered no unfair surprise and was not misled as a result of the original indictment being amended at the close of the Commonwealth's case in chief to include a charge that the underlying offense was committed by complicity."[57] We concluded that the Commonwealth fairly informed the defendant of its intentions and the defendant was free to "have developed its strategy accordingly."[58]

Here, the amendment was made on the first day of trial, before the jury was seated, providing ample time for the defense to adjust its case. The Commonwealth explained the requested amendments based upon evidence all known to Beasley. Because the amendment only added complicity offenses, the defense did not have to prepare any new or different evidence when the trial court permitted the amendment. Based upon the circumstances of this case, we cannot find that Beasley's substantial rights were prejudiced and conclude that the trial did not abuse its discretion when granting amendment of the indictment.

---

[57] *Id.* at 309.

[58] *Id.* (citing *Wolbrecht*, 955 S.W.2d at 537).

## CONCLUSION

For the foregoing reasons, the Jefferson Circuit Court's judgment is affirmed.

VanMeter, C.J.; Conley, Keller, Lambert, Nickell and Thompson, JJ., sitting. All concur. Bisig, J., not sitting.

COUNSEL FOR APPELLANT:

Jennifer Leigh Wade
Assistant Public Advocate

Emily Holt Rhorer
Assistant Public Advocate

COUNSEL FOR APPELLEE:

Daniel Cameron
Attorney General of Kentucky

Bryan Morrow
Assistant Attorney General

Jenna Marie Lorence
Assistant Attorney General